## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAM HANNUM, SEAN FREDERICK, OLGA MARYAMCHIK, VICTORIA CARUSO-DAVIS, SUSANA GUEVARA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE RETAIL EQUATION, INC., APPRISS INC., ADVANCE AUTO PARTS, INC., ADVANCE STORES COMPANY, INCORPORATED, BEST BUY CO., INC., BEST BUY PURCHASING LLC, BEST BUY STORES, L.P., BUY BUY BABY, INC., CALERES, INC., BG RETAIL, LLC, and DICK'S SPORTING GOODS, INC.,<br><br>Defendants. | Case No.   2:21-cv-997<br><br>**COMPLAINT - CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs William Hannum, Sean Frederick, Olga Maryamchik, Victoria Caruso-Davis, and Susana Guevara ("Plaintiffs"), individually and on behalf of all others similarly situated, allege on personal knowledge, investigation of counsel, and on information and belief as follows:

### BRIEF SUMMARY OF THE CASE

1.     Defendant The Retail Equation, Inc., along with its parent company, Defendant Appriss Inc. (collectively, "TRE"), is a technology company in the business of issuing reports on consumers in the form of "risk scores" to retailers contracting for its services. Risk scores are issued at a retailer's request when a consumer attempts a product return or exchange. Before accepting the return and issuing that consumer a store credit, or allowing the consumer to exchange the product, the retailer requests a "risk score" from TRE. TRE's "risk score" purports to be an accurate

evaluation of whether the consumer is engaged in retail fraud or other criminal activity. It is not, however, and has resulted in numerous consumers being falsely labeled fraudsters and for their otherwise permissible returns or exchanges to be denied.

2.      TRE generates its risk scores through analysis of data it has collected on consumers from both retailers and other sources – specifically, non-anonymized, individual Consumer Commercial Activity Data and Consumer ID Data (as defined below). This consumer data is shared and collected without the consent or knowledge of the consumers.

3.      There is no ability of consumers to request their own risk score, to appeal TRE and the retailer's decision to refuse a return or exchange, or to review or correct the data that forms the basis for TRE's risk score. Furthermore, TRE and retailers do not disclose to consumers the factors they consider in determining the risk score, or the minimum risk score a consumer must maintain to ensure their returns and exchanges will be accepted.

4.      TRE's present and former clients include: Defendant Advance Auto Parts, Inc., Defendant Advance Stores Company, Incorporated, Defendant Best Buy Co., Inc., Defendant Best Buy Purchasing LLC, Defendant Best Buy Stores, L.P., Defendant Buy Buy Baby, Inc., Defendant Caleres, Inc., Defendant BG Retail, LLC, and Defendant Dick's Sporting Goods, Inc. (collectively "Retail Defendants").

5.      Plaintiffs and Class members, defined below, were harmed by (a) the sharing of their Consumer Commercial Activity Data and Consumer ID Data by Retail Defendants, (b) the receipt of their Consumer Commercial Activity Data and Consumer ID Data by TRE, and (c) the use of their Consumer Commercial Activity Data and Consumer ID Data by all Defendants. Furthermore, as a result of the practices described above and herein, Retail Defendants have denied and continue to deny valid returns and exchanges.

6.      This is a class action against Defendants for invasion of privacy, violations of California's unfair competition law, Pennsylvania's consumer protection law, violations of the Fair Credit Reporting Act, and unjust enrichment.

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs bring a claim under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681e, *et seq*.

8.      This Court also has subject matter jurisdiction over this matter, including Plaintiffs' claims under state law, pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5,000,000 (exclusive of interests and costs), because in the aggregate the proposed nationwide Class is believed to number at least in the hundreds of thousands, and because at least one member of the Class is a citizen of a State different from Defendants.

9.      This Court has personal jurisdiction over all Defendants because they are authorized to do business and regularly conduct business in Pennsylvania. Defendant Dick's Sporting Goods, Inc. has its headquarters and principal place of business in Pennsylvania, and all Retail Defendants are authorized to do business in Pennsylvania, and regularly conduct business in Pennsylvania.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the headquarters and principal place of business of Dick's Sporting Goods, Inc. is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District. All Retail Defendants also maintain retail locations in this District and regularly conduct business in this District.

## STATEMENT OF FACTS

### Retail Defendants

11.     Defendant Advance Auto Parts, Inc. is a Delaware corporation with its principal place of business and headquarters in Raleigh, North Carolina. Defendant Advance Stores Company, Incorporated (collectively with Advance Auto Parts, Inc., "Advance Auto Parts") is a Virginia corporation, and a wholly owned subsidiary of Advance Auto Parts, Inc., with its principal pace of business in and headquarters in Roanoke, Virginia. Advance Auto Parts describes itself as "a leading automotive aftermarket parts provider that serves both professional installer and do-it-yourself customers." Across brands, Advance Auto Parts operates approximately 5,600 retail locations in the United States; of which approximately 241 are located in Pennsylvania.

12.     Defendant Best Buy Co., Inc. is a Minnesota corporation with its principal place of business and headquarters in Richfield, Minnesota. Defendant Best Buy Purchasing LLC is a Minnesota limited liability company. Defendant Best Buy Stores, L.P. is a Virginia limited partnership. Defendants Best Buy Purchasing LLC and Best Buy Stores, L.P. are wholly owned indirect subsidiaries of Best Buy Co., Inc. (collectively "Best Buy") with their principal place of business and headquarters in Richfield, Minnesota. Best Buy is the largest consumer electronics retailer in the United States. Best Buy operates approximately 1,030 retail locations in the United States; of which approximately 34 are located in Pennsylvania.

13.     Defendant Buy Buy Baby, Inc. is a Delaware corporation with its principal place of business and headquarters in Union, New Jersey. Buy Buy Baby (a subsidiary of Bed Bath & Beyond Inc.) is a retail concern specializing in merchandise for infants and young children. Buy Buy Baby operates approximately 125 retail locations in the United States; of which numerous are located in Pennsylvania.

14.     Defendant Caleres, Inc. is a New York corporation with its principal place of business and headquarters in St. Louis, Missouri. Defendant BG Retail, LLC (collectively with Caleres, Inc., "Caleres") is a Delaware limited liability company, and a wholly owned subsidiary of Caleres, Inc., with its principal place of business and headquarters in St. Louis, Missouri. Caleres, originally founded as Brown Shoe Company in 1878, is a global footwear company with annual net sales of $2.9 billion. Famous Footwear is a division of Caleres and operates approximately 900 retail locations in the United States, of which approximately 42 are located in Pennsylvania.

15.     Defendant Dick's Sporting Goods, Inc. is a Delaware corporation with its principal place of business and headquarters in Coraopolis, Pennsylvania. Dick's Sporting Goods describes itself as "a leading omni-channel sporting goods retailer offering an extensive assortment of authentic, high-quality sports equipment, apparel, footwear and accessories through its dedicated teammates, in-store services and unique specialty shop-in-shops." Dick's Sporting Goods operates approximately 950 retail locations in the United States, of which approximately 38 are located in Pennsylvania.

**Appriss and The Retail Equation**

16.     Defendant The Retail Equation, Inc. is a Delaware corporation, and wholly owned subsidiary of Appriss Inc., with its principal place of business and headquarters in Irvine, California. The Retail Equation describes itself as "the industry leader in retail transaction optimization solutions at the point of sale and point of return." The Retail Equation's technology "uses statistical modeling and analytics to detect fraudulent and abusive behavior when returns are processed at retailers' return counters."[1]

17.     Defendant Appriss Inc. is a Delaware corporation with its principal place of busines and headquarters in Louisville, Kentucky. Appriss, Inc., "provides artificial intelligence-based solutions to help retailers protect margin, unlock sales, and cut shrink."[2] Discussing Appriss' acquisition of The Retail Equation in 2015, Appriss CEO Mike Davis said: "We are excited to partner with The Retail Equation as we strengthen our strategy to combat organized crime and fraud in all industries."[3] Deven Parekh, chairman of the board for Appriss, further stated: "We believe that Appriss and The Retail Equation have unique capabilities that, together, provide a powerful improvement to the shopping experience by identifying and curbing employee dishonesty, consumer fraud and organized crime within retail."[4] Commenting on Appriss' acquisition and merger of Sysrepublic with The Retail Equation 2016, The Retail Equation President Mark Hammond echoed Mr. Parekh's sentiment: "We believe that Appriss, The Retail Equation, and Sysrepublic all bring

---

[1] THE RETAIL EQUATION, *Frequently Asked Questions*,
https://www.theretailequation.com/frequently-asked-questions/ (last visited July 27, 2021).

[2] APPRISS RETAIL, *Overview*, https://apprissretail.com/about/overview/ (last visited July 27, 2021).

[3] *Appriss Acquires The Retail Equation To Strengthen Efforts In Fighting Fraud And Mitigating Risk*, RETAIL SUPPLY CHAIN INSIGHTS (Aug. 19, 2015),
https://www.retailsupplychaininsights.com/doc/appriss-acquires-retail-equation-strengthen-fighting-fraud-mitigating-risk-0001.

[4] *Id.*

unique capabilities that, together, provide a powerful improvement to the shopping experience by identifying and curbing employee dishonesty, consumer fraud, and organized crime within retail."[5]

18.     Defendants The Retail Equation, Inc. and Appriss, Inc. (collectively, "TRE") hold numerous trademarks and patents examples of which are attached here to as Exhibits A through E.[6] TRE's patents make clear, and on that basis Plaintiffs specifically allege on information and belief, that TRE is processing merchandise returns and receiving customer information from Retail Defendants as disclosed in the specification, drawings and claims of TRE's '226 (Ex. A), '229 (Ex. B), '750 (Ex. C), and '839 (Ex. D) patents, and that Retail Defendants are processing merchandise returns and sharing customer information with TRE as disclosed in the specification, drawings and claims of TRE's '226, '229, '750, and '839 patents.

19.     Specifically, TRE's "return authorization system [] uses predictive algorithms and statistical models"[7] that are made possible by the capture of Consumer ID Data at the point-of-return. Matching transaction data to an individual consumer is accomplished through use of the consumer's government-issued identification and through "TRE's Receipt Triangulation"[8] technology. TRE's applications operate in more than 34,000 stores in North America, supporting a diverse retail base of specialty apparel, footwear, hard goods, department, big box, auto parts, drug/pharmacy, grocery, and more.

---

[5] *Appriss Acquires Sysrepublic; Further Enhances Efforts To Fight Retail Fraud, Protect Profits and Mitigate Risk*, LOSS PREVENTION INSIGHTS (Apr. 13, 2016), https://www.losspreventioninsights.com/doc/appriss-acquires-sysrepublic-further-fight-mitigate-risk-0001.

[6] Ex. A (U.S. Patent No. 7,455,226); Ex. B (U.S. Patent No. 8,025,229); Ex. C (U.S. Patent No. 8,356,750); Ex. D (U.S. Patent No. 9,996,839); Ex. E (U.S. Trademark Reg. No. 3,974,856); Ex. F (Combined Declaration of Use and/or Excusable Nonuse/ Application for Renewal of Registration of a Mark under Sections 8 & 9 for U.S. Trademark Reg. No. 3,974,856 filed with the USPTO on June 24, 2020); Ex. G (Notice of Renewal for U.S. Trademark Reg. No. 3,974,856 issued by the USPTO on August 14, 2020).

[7] APPRISS RETAIL, *Verify*, https://apprissretail.com/solutions/verify/ (last visited July 27, 2021).

[8] APPRISS, https://appriss.com/retail/wp-content/uploads/sites/4/2017/02/TRE2026-QuickOverview-Verify-3-customer-service.pdf (last visited July 27, 2021).

**Defendants' Data Collection, Sharing and Use**

20.     TRE provides services to retailers targeted at "identifying and curbing employee dishonesty, consumer fraud and organized crime within retail."[9] In order to accomplish this analysis, TRE collects data "using a wide variety of data collection technologies" used "in conjunction with stored data, including data collected from other merchants," including from Retail Defendants.[10]

21.     Without the knowledge or consent of consumers, Retail Defendants are engaged in a continuous process of collecting and sharing with TRE large amounts of data about their consumers. Retail Defendants' data collection efforts are most prevalent at the point of sale and point of return and exchange, but occur more broadly elsewhere, e.g., in interactions through Retail Defendants' website. Consumer data collected by Retail Defendants and shared with TRE falls broadly within two categories: "Consumer Commercial Activity Data" and "Consumer ID Data."

22.     As used herein, "Consumer Commercial Activity Data" collected by Retail Defendants and shared with TRE includes, but is not limited to, each customers' unique purchase, return, and exchange history, i.e., what a consumer buys, when a consumer buys, where a consumer buys, how much a consumer buys, how often a consumer buys, what form of payment a consumer uses, etc. The same, or similar, data is also collected for returns and exchanges.

23.     As used herein, "Consumer ID Data" collected by Retail Defendants and shared with TRE includes, but is not limited to, all unique identification information contained on or within a consumer's driver's license, government-issued ID card, or passport, e.g., the consumer's name, date of birth, race, sex, photograph, complete street address, and zip code.

---

[9] *Appriss Acquires Sysrepublic; Further Enhances Efforts To Fight Retail Fraud, Protect Profits and Mitigate Risk*, LOSS PREVENTION INSIGHTS (Apr. 13, 2016), https://www.losspreventioninsights.com/doc/appriss-acquires-sysrepublic-further-fight-mitigate-risk-0001.

[10] Ex. A (U.S. Patent No. 7,455,226) at abstract, at col. 1, line 65 to col. 2, line 13, at col. 19, lines 32-36, at col. 21, lines 39-43, and at claim 1; Ex. C (U.S. Patent No. 8,356,750) at claim 1; Ex. D (U.S. Patent No. 9,996,839) at claim 1; *see also* Ex. E (U.S. Trademark Reg. No. 3,974,856) ("PROVIDING RETURN AUTHORIZATION SERVICES TO RETAILERS . . . BY CHECKING THE DATABASE FOR CONSUMERS' PRIOR RETURN HISTORY WITH MULTIPLE RETAILERS.").

24.     The Consumer Commercial Activity Data and Consumer ID Data collected by Retail Defendants and shared with TRE are non-anonymized and individual data sets, as opposed to anonymized and collective data sets. The Consumer Commercial Activity Data and Consumer ID Data collected by Retail Defendants and shared with TRE have not been sanitized and personally identifiable information has not been removed. The Consumer Commercial Activity Data and Consumer ID Data includes personal information, as defined in California Civil Code section 1798.81.5(A)(1)(d).

25.     While the collection and use of this information without notice to or consent from consumers is shocking and unlawful in itself, it is only the tip of the iceberg with respect to TRE's and the Retail Defendants' unlawful data practices. TRE's filings with the U.S. Patent and Trademark Office are stunning and reveal data collection efforts that are far wider, deeper, and more intrusive than TRE admits.

26.     TRE's filings with the Patent and Trademark Office indicate that, when evaluating the return behavior of a consumer, TRE uses not just data related to that consumer but also "transaction data collected at points of return from other customers thought to be related to this customer by home address, family name, or other connecting data."[11] In other words, TRE factors into its analysis whatever data it has on people thought to be related to the customer by any "connecting data," i.e., individuals found in a customer's social network. Thus, for example, if TRE believes (rightly or wrongly) that one of your Facebook friends is a fraudster, TRE may label you a likely fraudster as well.

27.     Perhaps even more disturbing is TRE's mind-boggling statement that, in determining whether a return should be rejected, TRE considers "information about other customers in the merchant location during the time of the requested return transaction."[12] Therefore, simply being in

---

[11] Ex. A ('226 patent) at col. 13, lines 64-66.

[12] Ex. A ('226 patent) at col. 17, lines 54-56.

the same store as another consumer who TRE suspects of fraud could lead TRE to associate the conduct of an otherwise entirely innocent consumer with that of a suspected criminal.

28.     Finally, adding further injury, TRE claims to apply artificial intelligence to all of its collected data, yielding even deeper insights into consumers' private lives.

**Attempted Return or Exchange Process**

29.     Every time a consumer purchases goods from Retail Defendants, included in the bargain is the ability to return for store credit or exchange the purchased goods within a specified period of time.

30.     When a consumer attempts to make a return or exchange, Retail Defendants swipe or scan the consumer's driver's license, government-issued ID card, or passport and the original sales transaction receipt (if present), thereby identifying the consumer and the consumer's unique purchase, return, and exchange behavior. New Consumer Commercial Activity Data and Consumer ID Data are also generated at this time.

31.     Without the consent or knowledge of consumers, Retail Defendants transmit to and share with TRE the Consumer Commercial Activity Data and Consumer ID Data they collect from consumers when consumers attempt to make a return or exchange. This data transfer is in addition to, and subsequent to, prior transfers of Consumer Commercial Activity Data and Consumer ID Data that occur on a continuous basis.

32.     TRE then uses this data to identify the consumer, analyzes the data in combination with the other data it has collected on the consumer described above, and then generates a consumer report containing a "risk score" for each consumer attempting to return or exchange merchandise at one of Retail Defendants' stores (or any retailer unnamed herein that is using TRE's service). The "risk score" is TRE's assessment of the likelihood the return or exchange consumer is committing fraud, or other organized crime within retail. Then, using the consumer's "risk score" as a pretext, TRE notifies the Retail Defendant that the attempted returns or exchanges should be denied as a consequence of suspected "fraudulent and abusive" behavior by the consumer, implicitly labeling

the consumer a fraudster. "Risk scores" identifying consumers as fraudsters occur even when the return or exchange is valid and there is no criminal, or even improper, conduct by a consumer.

33.     It is hard to imagine a more invasive collection and pernicious use of information in a "normal" retail setting. Yet, there is no advance notice to consumers of TRE's involvement in retail transactions; consumers are entirely unaware that they are submitting to this surreptitious process of judgment based on TRE's analysis of all the information that its massive data mining effort has yielded. And, when TRE determines that the retailer should reject an attempted return, TRE makes no effort to verify with the customer the actual circumstances of the return or the accuracy of the data on which the rejection is based.

34.     TRE's covert use of personal data to render judgment on the fitness of a consumer to execute a simple return or exchange of merchandise violates a basic assumption of the retail marketplace. One of the reasons that consumers are drawn to large national retailers is the ease of return and exchange: if a consumer buys a shirt for their spouse, they feel secure that they can return or exchange that gift if it doesn't fit or is the wrong color. Consumers do not expect that the retailer will decide whether to allow a return or exchange based on a "risk score" created by a third-party "big data" aggregator based on information like the consumer's personal data and shopping history, let alone information about other individuals "thought to be related" to the consumer or "other customers in the merchant location" at the time of the return.

35.     Because of the widespread adoption of TRE's service—as evidenced by the number and size of retailers named herein—TRE's labeling of a consumer as a "likely fraudster" acts as the equivalent of a "scarlet letter" for merchandise returns, for which there is no appeal process and no forewarning. This danger is not hypothetical. Each Retail Defendant refused a valid return or exchange based on TRE's scarlet letter concerning one of the Plaintiffs. There was no appeal process, no human to whom Plaintiff could explain the return, nor any advance notice that a "risk score" declaring them a fraudster would be generated.

36.     Thus, a consumer branded by TRE as a high fraud risk has no idea which other retailers—Retail Defendants and others—might reject future merchandise returns based on TRE's

incorrect evaluation. The consumer must now live with the fear that any attempted return may be rejected, causing not only the economic harm of forcing the consumer to retain unwanted goods, but also subjecting the consumer to substantial inconvenience as well as the embarrassment of being identified as a criminal and a fraud risk.

37.     Plaintiffs are not the only ones concerned by this behavior. The District Attorneys of the Counties of Alameda, Riverside, and Santa Barbara together filed a complaint in December 2020 against Defendant Best Buy for, among other things, "[f]ailing to disclose in its posted return policy the existence of a third-party, The Retail Equation, that monitored the sale and return, refund or exchange activity of California consumers, and who was authorized by Defendant to deny a return, refund or exchange, in violation of Civil Code section 1723(a)."[13]

### Plaintiff Hannum

38.     Plaintiff William Hannum is an individual residing in Point Pleasant, West Virginia.

39.     On or about March 4, 2019, Plaintiff Hannum attempted to return or exchange merchandise previously purchased from Advance Auto Parts. Plaintiff Hannum expected to receive, at a minimum, store credit in exchange for the return.

40.     Advance Auto Parts' sales associate entered Plaintiff Hannum's identifying and transaction information into Advance Auto Parts' computer system.

41.     Advance Auto Parts transmitted Plaintiff Hannum's identifying and transaction information to TRE. This new identifying and transaction information is in addition to the other Consumer ID Data and Commercial Activity Data already transmitted to TRE, or otherwise collected by TRE, as alleged above.

42.     Advance Auto Parts' sales associate did not notify Plaintiff Hannum that his identifying and transaction information was being transmitted to TRE.

---

[13] Complaint filed in *State of California v. Best Buy Stores, L.P.,* No. CVRI2000477 (Cal. Super. Ct. Dec. 9, 2020), at ¶ 11.D; *see also id.* ¶ 7.

43.     Plaintiff Hannum did not know his identifying and transaction information was being transmitted to TRE.

44.     Advance Auto Parts' sales associate did not notify Plaintiff Hannum that his identifying and transaction information transmitted to TRE was being used by TRE to generate a "risk score" for him from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange.

45.     Plaintiff Hannum did not know that his identifying and transaction information transmitted to TRE was being used by TRE to generate a "risk score" for him from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange.

46.     After Advance Auto Parts entered Plaintiff Hannum's identifying and transaction information into its computer system, and transmitted that information to TRE, TRE communicated to Advance Auto Parts' sales associate that the attempted return or exchange was to be declined.

47.     After entering Plaintiff Hannum's identifying and transaction information into Advance Auto Parts' computer system and receiving the communication from TRE, Advance Auto Parts' sales associate communicated to Plaintiff Hannum that the return or exchange was declined based upon the recommendation of TRE.

48.     Advance Auto Parts' sales associate presented Plaintiff Hannum a printout stating the return or exchange was declined and providing contact information for TRE.

49.     Plaintiff Hannum was thereby prevented from completing the return or exchange.

**Plaintiff Frederick**

50.     Plaintiff Sean Frederick is an individual residing in Allison Park, Pennsylvania.

51.     On or about March 19, 2018, Plaintiff Frederick attempted to return or exchange merchandise previously purchased from Best Buy. Plaintiff Frederick expected to receive, at a minimum, store credit in exchange for the return.

52.     Best Buy's sales associate entered Plaintiff Frederick's identifying and transaction information into Best Buy's computer system.

53.     Best Buy transmitted Plaintiff Frederick's identifying and transaction information to TRE. This new identifying and transaction information is in addition to the other Consumer ID Data and Commercial Activity Data already transmitted to TRE, or otherwise collected by TRE, as alleged above.

54.     Best Buy's sales associate did not notify Plaintiff Frederick that his identifying and transaction information was being transmitted to TRE.

55.     Plaintiff Frederick did not know his identifying and transaction information was being transmitted to TRE.

56.     Best Buy's sales associate did not notify Plaintiff Frederick that his identifying and transaction information transmitted to TRE was being used by TRE to generate a "risk score" for him from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange.

57.     Plaintiff Frederick did not know that his identifying and transaction information transmitted to TRE was being used by TRE to generate a "risk score" for him from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange.

58.     After Best Buy entered Plaintiff Frederick's identifying and transaction information into its computer system, and transmitted that information to TRE, TRE communicated to Best Buy's sales associate that the attempted return or exchange was to be declined.

59.     After entering Plaintiff Frederick's identifying and transaction information into Best Buy's computer system and receiving the communication from TRE, Best Buy's sales associate communicated to Plaintiff Frederick that the return or exchange was declined based upon the recommendation of TRE.

60.     Best Buy's sales associate presented Plaintiff Frederick a printout stating the return or exchange was declined and providing contact information for TRE.

61.     Plaintiff Frederick was thereby prevented from completing the return or exchange.

**Plaintiff Maryamchik**

62.     Plaintiff Olga Maryamchik is an individual residing in Brooklyn, New York.

63.     On or about December 24, 2019, Plaintiff Maryamchik attempted to return or exchange merchandise previously purchased from Buy Buy Baby. Plaintiff Maryamchik expected to receive, at a minimum, store credit in exchange for the return.

64.     Plaintiff Maryamchik provided her credit card at the Buy Buy Baby sales associate's request. Buy Buy Baby's sales associate scanned, swiped, and/or entered Plaintiff Maryamchik's identifying and transaction information into Buy Buy Baby's computer system.

65.     Buy Buy Baby's sales associate entered Plaintiff Maryamchik's identifying and transaction information into Buy Buy Baby's computer system.

66.     Buy Buy Baby transmitted Plaintiff Maryamchik's identifying and transaction information to TRE. This new identifying and transaction information is in addition to the other Consumer ID Data and Commercial Activity Data already transmitted to TRE, or otherwise collected by TRE, as alleged above.

67.     Buy Buy Baby's sales associate did not notify Plaintiff Maryamchik that her identifying and transaction information was being transmitted to TRE.

68.     Plaintiff Maryamchik did not know her identifying and transaction information was being transmitted to TRE.

69.     Buy Buy Baby's sales associate did not notify Plaintiff Maryamchik that her identifying and transaction information transmitted to TRE was being used by TRE to generate a "risk score" for her from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange.

70.     Plaintiff Maryamchik did not know that her identifying and transaction information transmitted to TRE was being used by TRE to generate a "risk score" for her from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange.

71.     After Buy Buy Baby entered Plaintiff Maryamchik's identifying and transaction information into its computer system, and transmitted that information to TRE, TRE communicated to Buy Buy Baby's sales associate that the attempted return or exchange was to be declined.

72.     After entering Plaintiff Maryamchik's transaction identifying and information into Buy Buy Baby's computer system and receiving the communication from TRE, Buy Buy Baby's sales associate communicated to Plaintiff Maryamchik that the return or exchange was declined based upon the recommendation of TRE.

73.     Buy Buy Baby's sales associate presented Plaintiff Maryamchik a printout stating the return or exchange was declined and providing contact information for TRE.

74.     Plaintiff Maryamchik was thereby prevented from completing the return or exchange.

### Plaintiff Caruso-Davis

75.     Plaintiff Victoria Caruso-Davis is an individual residing in South Plainfield, New Jersey.

76.     On or about October 29, 2019, Plaintiff Caruso-Davis attempted to return or exchange merchandise previously purchased from Famous Footwear. Plaintiff Caruso-Davis expected to receive, at a minimum, store credit in exchange for the return.

77.     Plaintiff Caruso-Davis provided her driver's license at the Famous Footwear sales associate's request. The Famous Footwear sales associate scanned, swiped, and/or entered Plaintiff Caruso-Davis's identifying and transaction information into Famous Footwear's computer system.

78.     Plaintiff Caruso-Davis provided her credit card at the Famous Footwear's sales associate request. The Famous Footwear's sales associate entered Plaintiff Caruso-Davis's identifying and transaction information into Famous Footwear's computer system.

79.     Famous Footwear transmitted Plaintiff Caruso-Davis's identifying and transaction information to TRE. This new identifying and transaction information is in addition to the other Consumer ID Data and Commercial Activity Data already transmitted to TRE, or otherwise collected by TRE, as alleged above.

80.     Famous Footwear's sales associate did not notify Plaintiff Caruso-Davis that her identifying and transaction information was being transmitted to TRE.

81.     Plaintiff Caruso-Davis did not know her identifying and transaction information was being transmitted to TRE.

82.     Famous Footwear's sales associate did not notify Plaintiff Caruso-Davis that her identifying and transaction information transmitted to TRE was being used by TRE to generate a "risk score" for her from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange.

83.     Plaintiff Caruso-Davis did not know that her identifying and transaction information transmitted to TRE was being used by TRE to generate a "risk score" for her from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange.

84.     After Famous Footwear entered Plaintiff Caruso-Davis's identifying and transaction information into its computer system, and transmitted that information to TRE, TRE communicated to Famous Footwear's sales associate that the attempted return or exchange was flagged as potentially fraudulent and that future attempts by Plaintiff Caruso-Davis to return or exchange merchandise would be declined.

85.     After entering Plaintiff Caruso-Davis's identifying and transaction information into Famous Footwear's computer system and receiving the communication from TRE, Famous Footwear's sales associate communicated to Plaintiff Caruso-Davis that the return or exchange was flagged as potentially fraudulent and that future attempts by Plaintiff Caruso-Davis to return or exchange merchandise would be declined based upon the recommendation of TRE.

86.     Famous Footwear's sales associate presented Plaintiff Caruso-Davis a printout stating the return or exchange was flagged as potentially fraudulent and that future attempts by Plaintiff Caruso-Davis to return or exchange merchandise would be declined and providing contact information for TRE.

87.    Plaintiff Caruso-Davis was thereby prevented from making future returns or exchanges.

**Plaintiff Guevara**

88.    Plaintiff Susana Guevara is an individual residing in Fairfax, Virginia.

89.    On or about June of 2020, Plaintiff Guevara attempted to return or exchange merchandise previously purchased from Dick's Sporting Goods. Plaintiff Guevara expected to receive, at a minimum, store credit in exchange for the return.

90.    Dick's Sporting Goods' sales associate entered Plaintiff Guevara's identifying and transaction information into Dick's Sporting Goods' computer system.

91.    Dick's Sporting Goods transmitted Plaintiff Guevara's identifying and transaction information to TRE. This new identifying and transaction information is in addition to the other Consumer ID Data and Commercial Activity Data already transmitted to TRE, or otherwise collected by TRE, as alleged above.

92.    Dick's Sporting Goods' sales associate did not notify Plaintiff Guevara that her identifying and transaction information was being transmitted to TRE.

93.    Plaintiff Guevara did not know her identifying and transaction information was being transmitted to TRE.

94.    Dick's Sporting Goods' sales associate did not notify Plaintiff Guevara that her identifying and transaction information transmitted to TRE was being used by TRE to generate a "risk score" for her from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange.

95.    Plaintiff Guevara did not know that her identifying and transaction information transmitted to TRE was being used by TRE to generate a "risk score" for her from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange.

96.     After Dick's Sporting Goods entered Plaintiff Guevara's identifying and transaction information into its computer system, and transmitted that information to TRE, TRE communicated to Dick's Sporting Goods' sales associate that the attempted return or exchange was to be declined.

97.     After entering Plaintiff Guevara's identifying and transaction information into Dick's Sporting Goods' computer system and receiving the communication from TRE, Dick's Sporting Goods' sales associate communicated to Plaintiff Guevara that the return or exchange was declined based upon the recommendation of TRE.

98.     Dick's Sporting Goods' sales associate presented Plaintiff Guevara a printout stating the return or exchange was declined and providing contact information for TRE.

99.     Plaintiff Guevara was thereby prevented from completing the return or exchange.

## CLASS ALLEGATIONS

100.     Plaintiffs bring this class action lawsuit individually and on behalf of the proposed Class members under Rule 23 of the Federal Rules of Civil Procedure.

101.     Plaintiffs seek certification of the following Class:

**National Class**: All persons in the United States who had their data transmitted by a Retail Defendant to The Retail Equation.

102.     Specifically excluded from the Class are Defendants and any entities in which Defendants have a controlling interest, Defendants' agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

103.     **Numerosity:** Plaintiffs do not know the exact number of Class members, but believe the Class comprises hundreds of thousands of consumers throughout the United States. As such, Class members are so numerous that joinder of all members is impracticable.

104.     **Commonality:** Common questions of law and fact exist and predominate over any questions affecting only individual Class members. The common questions include:

a.     Whether Defendants engaged in the conduct alleged herein;

b.      Whether Retail Defendants' conduct constituted deceptive trade practices actionable under the applicable consumer protection laws;

c.      Whether TRE defamed Plaintiffs and Class members by advising Retail Defendants that attempted returns and exchanges were fraudulent, abusive, or an organized crime and should, therefore, be denied;

d.      Whether Defendants' policies and procedures purposefully target consumers of specific socioeconomic backgrounds;

e.      Whether Defendants' policies and procedures negligently affect consumers of specific socioeconomic backgrounds;

f.      Whether Defendants violated the FCRA;

g.      Whether Plaintiffs and Class members are entitled to recover actual damages and/or statutory damages; and

h.      Whether Plaintiffs and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

105.    **Typicality:** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and Class members were injured through Defendants' uniform misconduct and their legal claims arise from the same core practices of Defendants.

106.    **Adequacy:** Plaintiffs will fairly and adequately protect Class members' interests. Plaintiffs have no interests antagonistic to Class members' interests, and Plaintiffs have retained counsel that has considerable experience and success in prosecuting complex class action and consumer-protection cases.

107.    **Risks:** The proposed action meets the requirements of Fed. R. Civ. P. 23(b)(1) because prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications that would establish incompatible standards for Defendants. Retail Defendants collect and share, and TRE maintains and uses Consumer Commercial Activity Data and Consumer ID Data of the Class members and other individuals, and varying adjudications

could establish incompatible standards with respect to: whether Defendants' ongoing conduct violates Class members' rights as alleged herein; and whether the injuries suffered by Class members are legally cognizable, among others. Prosecution of separate actions by individual Class members would also create a risk of individual adjudications that would be dispositive of the interests of other Class members not parties to the individual adjudications, or substantially impair or impede the ability of Class members to protect their interests.

108.    **Injunctive Relief:** The proposed action meets the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants have acted or have refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

109.    **Predominance:** The proposed action meets the requirements of Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions that may affect only individual Class members in the proposed Class.

110.    **Superiority:** The proposed action also meets the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to all other available methods of fairly and efficiently adjudicating this dispute. The injury sustained by each Class member, while meaningful on an individual basis, is not of such magnitude that it is economically feasible to prosecute individual actions against Defendants. Even if it were economically feasible, requiring hundreds of thousands of injured plaintiffs to file individual suits would impose a crushing burden on the court system and almost certainly lead to inconsistent judgments. By contrast, class treatment will present far fewer management difficulties and provide the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court. Plaintiffs anticipate no unusual difficulties in managing this class action.

111.    **Certification of Particular Issues:** In the alternative, the Class may be maintained as class actions with respect to particular issues, in accordance with Fed. R. Civ. P. 23(c)(4).

112.    Finally, all members of the purposed Class are identifiable. Defendants have access to addresses and other contact information for members of the Class, which can be used to identify Class members.

## COUNT I
## Invasion of Privacy
## (Against all Defendants on behalf of the Class)

113.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

114.    Plaintiffs and Class members reasonably expected that their Consumer Commercial Activity Data and Consumer ID Data would be kept private and secure, including the information on their driver's license, passport, or other government issued identification when Plaintiffs provided them.

115.    Plaintiffs and Class members reasonably expected that their Consumer Commercial Activity Data and Consumer ID Data would not be collected, used, sold, and/or disclosed by Defendants without appropriate notice and/or disclosures.

116.    Defendants unlawfully invaded Plaintiffs' and Class members' privacy rights by:

a.      collecting, selling, using and/or disclosing Plaintiffs' and Class members' Consumer Commercial Activity Data and Consumer ID Data in a manner highly offensive to a reasonable person;

b.      collecting, selling, using and/or disclosing Plaintiffs' and Class members' Consumer Commercial Activity Data and Consumer ID Data without appropriate notice and/or disclosures; and

c.      collecting, selling, using and/or disclosing Plaintiffs' and Class members' Consumer Commercial Activity Data and Consumer ID Data without their informed, voluntary, affirmative, and clear consent.

117.    In collecting, selling, using and/or disclosing Plaintiffs' and Class members' Consumer Commercial Activity Data and Consumer ID Data, Defendants acted in reckless disregard

of Plaintiffs' and Class members' privacy rights. Defendants knew or should have known that collecting, selling, using and/or disclosing Consumer Commercial Activity Data and Consumer ID Data, is highly offensive to a reasonable person in Plaintiffs' and Class members' position.

118.    Defendants violated Plaintiffs' and Class members' right to privacy under the common law.

119.    As a direct and proximate result of Defendants' unlawful invasions of privacy, Plaintiffs' and Class members' reasonable expectations of privacy were frustrated and defeated. Defendants' unlawful invasions of privacy damaged Plaintiffs and Class members as set forth above, and they are entitled to appropriate relief.

**COUNT II**
**Violations of California's Unfair Competition Law**
**California Business & Professions Code § 17200 et seq.**
**(Against TRE on behalf of the Class)**

120.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

121.    Section 17200 of the California Business & Professions Code ("UCL") prohibits any "unlawful," "unfair," or "fraudulent" business practices.

122.    TRE violated, and continues to violate, the "unlawful" and "unfair" prongs of the UCL by receiving from Retail Defendants the Consumer Commercial Activity Data and Consumer ID Data Retail Defendants collected from Plaintiffs and Class members without the consent or knowledge of Plaintiffs and Class members in violation of Plaintiffs' and Class members' right to privacy under the common law, California Constitution, Article I, Section 1, and the California Consumer Privacy Act of 2018 sections 1798.100(b), 1798.110(c), and 1798.115(c) and (d).

123.    TRE's practice of receiving from Retail Defendants the Consumer Commercial Activity Data and Consumer ID Data Retail Defendants collected from Plaintiffs and Class members is and was immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially

injurious to Plaintiffs and Class members. TRE's practice is and was also contrary to legislatively declared and public policy and the harm it caused to consumers outweighed its utility, if any.

124.    TRE violated, and continue to violate, the "unlawful" and "unfair" prongs of the UCL by using the Consumer Commercial Activity Data and Consumer ID Data Retail Defendants collected from Plaintiffs and Class members without the consent or knowledge of Plaintiffs and Class members in violation of Plaintiffs' and Class members' right to privacy under the common law, and, in generating "risk scores" for Plaintiffs and Class Members, TRE violated the Fair Credit Reporting Act sections 1681e(b), 1681g(f), 1681i, and 1681j, as alleged *infra* Count IV.

125.    TRE's practice of using the Consumer Commercial Activity Data and Consumer ID Data Retail Defendants collected from Plaintiffs and Class members is and was immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and Class members. Retail Defendants' and TRE's practice is and was also contrary to legislatively declared and public policy and the harm it caused to consumers outweighed its utility, if any.

126.    As a direct and proximate result of TRE's unlawful and unfair conduct, Plaintiffs and Class members have had their privacy rights violated and lost money and property.

127.    TRE's conduct caused substantial injury to Plaintiffs and Class members. Accordingly, Plaintiffs seek an order enjoining TRE from committing such unlawful and unfair business practices, and seek the full amount of money Plaintiffs and Class members paid for the purchased goods and/or restitutionary disgorgement of profits. Plaintiffs also seek attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

### COUNT III
### Violations of the Pennsylvania Unfair Trade Practices and
### Consumer Protection Law, 73 Pa. Stat. § 201-1, *et seq.*
### (Against all Defendants on behalf of the Class)

128.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

129.    Plaintiffs, the Class members, and Defendants are "persons" as defined by 73 Pa. Stat. § 201-2(2).

130.    Plaintiffs and the Class members purchased goods and services in "trade" and "commerce" as defined by 73 Pa. Stat. § 201-2(3).

131.    Plaintiffs and the Class members purchased goods and services primarily for personal, family, and/or household purposes under 73 Pa. Stat. § 201-9.2.

132.    Retail Defendants and Appriss Inc. engaged in "unfair methods of competition" or "unfair or deceptive acts or practices" as defined by 73 Pa. Stat. § 201-2(4) by, among other things, engaging in the following conduct:

        a.    Advertising their goods and services with intent not to sell them as advertised (73 Pa. Stat. § 201-2(4)(ix)); and

        b.    "Engaging in any other . . . deceptive conduct which creates a likelihood of confusion or of misunderstanding" (73 Pa. Stat. § 201-2(4)(xxi)).

133.    These unfair methods of competition and unfair or deceptive acts or practices are declared unlawful by 73 Pa. Stat. § 201-3.

134.    Retail Defendants' unfair or deceptive acts and practices include but are not limited to Retail Defendants' practice of transmitting to and sharing with TRE the Consumer Commercial Activity Data and Consumer ID Data they collected from Plaintiffs and Class members, and Retail Defendants' and TRE's practice of using the Consumer Commercial Activity Data and Consumer ID Data Retail Defendants collected from Plaintiffs and Class members.

135.    Retail Defendants and Appriss Inc. intended to mislead consumers and induce them to rely on their misrepresentations and omissions, and Plaintiffs and Class members did rely on

their misrepresentations and omissions relating to their use, sharing, and security of their data, and the return and/or exchange process.

136.    Plaintiffs and Class members acted reasonably in relying on Retail Defendants and Appriss Inc.'s misrepresentations and omissions, the truth of which they could not have discovered with reasonable diligence.

137.    Had Retail Defendants and Appriss Inc. disclosed to consumers that how they would share and use their data, and that their return and/or exchange process, Plaintiff Rossi and Pennsylvania Subclass Members would not have given their Consumer Commercial Activity Data and Consumer ID Data to Retail Defendants.

138.    Retail Defendants and Appriss Inc. acted intentionally, knowingly, and maliciously in violating 73 Pa. Stat. § 201-1, *et seq.*, and recklessly disregarded consumers' rights.

139.    As a direct and proximate result of Retail Defendants and Appriss Inc. violation of violating 73 Pa. Stat. § 201-1, *et seq.*, Plaintiffs and Class members have suffered and will continue to suffer damages, injury, ascertainable losses of money or property, and monetary and non-monetary damages as alleged herein.

140.    Plaintiffs and Class members seek all remedies available under 73 Pa. Stat. § 201-1, *et seq.*, including, but not limited to, the damages expressly permitted under 73 Pa. Stat. § 201-9.2:  actual damages or statutory damages of $100, whichever is greater; treble damages defined as three time the actual damages; reasonable attorneys' fees and litigation costs; and any other such additional relief the Court deems necessary or proper.

141.    Plaintiffs and Class members also seek injunctive relief as set forth herein.

**COUNT IV**
**Violation of Fair Credit Reporting Act**
**(Against TRE on behalf of the Class)**

142.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

143.    As individuals, Plaintiffs and Class members are consumers entitled to the protections of the FCRA. 15 U.S.C. § 1681a(c).

144.    Under the FCRA, a "consumer reporting agency" is defined as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties . . . ." 15 U.S.C. § 1681a(f).

145.    TRE is a consumer reporting agency under the FCRA because, for monetary fees, it regularly engages in the practice of assembling or evaluating information on consumers for the purpose of furnishing consumer reports to third parties.

146.    The Consumer Financial Protection Bureau ("CFPB")—the agency of the United States government responsible for consumer protection in the financial sector—identifies TRE as a consumer reporting agency. TRE is the only consumer reporting agency identified by the CFPB in the retail sector.[14]

147.    Under the FCRA, a "consumer report" is defined as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for -- (A) credit or insurance to be used primarily for personal, family, or household purposes; (B) employment purposes; or (C) any other purpose authorized under section 1681b of this title." 15 U.S.C. § 1681a(d)(1).

---

[14] CONSUMER FINANCIAL PROTECTION BUREAU, LIST OF CONSUMER REPORTING COMPANIES (2021), https://files.consumerfinance.gov/f/documents/cfpb_consumer-reporting-companies-list_2021-06.pdf.

148.     The communications by TRE to Retail Defendants were consumer reports under the FCRA because they were communications of information bearing on Plaintiffs' and Class members' credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living used, or expected to be used or collected in whole or in part, for the purpose of serving as a factor in determining whether or not to issue consumers store credit in exchange for returned products. For example, TRE's '226 patent explains that TRE "may provide an authorization determination recommending that the clerk offer store credit or some other alternative in place of a requested cash exchange for the cash value of the returned merchandise." Ex. A ('226 patent) at col. 6, lines 39-42.

149.     Under the FCRA "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). TRE fails to comply with its obligation under this provision of the FCRA because, for instance, it incorrectly identified Plaintiffs as fraudsters, or engaged in other criminal activity, when, in fact, they were legitimate consumers properly requesting store credit or exchanges for returned products.

150.     TRE also violates 15 U.S.C. § 1681g(f) by failing to disclose, upon request or otherwise, consumers' "risk scores," or any information concerning those scores, to such consumers, or any information concerning those scores.

151.     Under the FCRA any consumer reporting agency must provide, upon request, disclose to consumers "all information in the consumer's file at the time of the request," (15 U.S.C. § 1681g and 1681j), and reinvestigate any disputed information (15 U.S.C. § 1681i). TRE fails to comply with its obligation under these provisions of the FCRA, because, for instance, TRE will provide consumers only a limited version of the full data file that it maintains on them containing returns and exchanges and not the other information TRE collects from social media and other sources. TRE provides no avenue for correcting or reinvestigating disputed information.

152.     TRE acted willfully because it knew or should have known about its legal obligations under the FCRA. These obligations are well established in the plain language of the FCRA and in

the promulgations of the Federal Trade Commission. TRE obtained, or had available, these and other substantial written materials that apprised it of its duties under the FCRA. Any reasonable consumer reporting agency knows or should know about these requirements. Despite knowing of these legal obligations, TRE acted consciously in breaching known duties and depriving Plaintiffs and Class members of their rights under the FCRA.

153.    Plaintiffs and Class members have been damaged by TRE's willful failure to comply with the FCRA. Therefore, Plaintiffs and Class members are entitled to recover "any actual damages sustained by the consumer . . . or damages of not less than $100 and not more than $1,000." 15 U.S.C. § 1681n(a)(1)(A).

154.    Plaintiffs and Class members are also entitled to punitive damages, costs of the action, and reasonable attorneys' fees. 15 U.S.C. § 1681n(a)(2),(3).

## COUNT V
## Unjust Enrichment
## (Against all Defendants on behalf of the Class)

155.    Plaintiffs reallege and incorporate by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

156.    Defendants have been unjustly enriched by unlawfully sharing, receiving, and using Consumer Commercial Activity Data and Consumer ID Data Retail Defendants collected from Plaintiffs and Class members without the consent or knowledge of Plaintiffs and Class members.

157.    Plaintiffs and Class members would not have purchased merchandise from Retail Defendants had they known their Consumer Commercial Activity Data and Consumer ID Data was being shared, received, and used by Defendants in the manner described herein.

158.    Plaintiffs and Class members would not have paid as much for merchandise from Retail Defendants had they known their Consumer Commercial Activity Data and Consumer ID Data was being shared, received, and used by Defendants in the manner described herein.

159.    There is no other adequate remedy at law. It would be unjust and unfair for Defendants to retain any of the benefits obtained from their unlawful conduct.

160.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendants received.

161.    A constructive trust should be imposed on all unlawful or inequitable sums received by Defendants traceable to Plaintiffs and Class members.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of the Class, respectfully request that the Court order relief enter judgment in their favor and against Defendants as follows:

A.    An order certifying Plaintiffs' proposed Class and appointing Plaintiffs and Plaintiffs' counsel to represent the Class;

B.    An order that Defendants are permanently enjoined from their improper conduct and practices as alleged;

C.    A judgment awarding Plaintiffs and Class members appropriate monetary relief, including actual and statutory damages, restitution, and disgorgement;

D.    An order that Defendants pay the costs involved in notifying the Class members about the judgment and administering the claims process;

E.    Pre-judgment and post-judgment interest;

F.    Attorneys' fees, expenses, and the costs of this action; and

G.    All other and further relief as this Court deems necessary, just, and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

DATED: July 27, 2021                    Respectfully submitted,

*/s/ Benjamin F. Johns*
Benjamin F. Johns
*BFJ@chimicles.com*
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH, LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041

610.642.8500 (*telephone)*
610.649.3633 (*facsimile*)

Tina Wolfson*
*twolfson@ahdootwolfson.com*
Theodore Maya*
*tmaya@ahdootwolfson.com*
Bradley K. King*
*bking@ahdootwolfson.com*
Christopher Stiner*
*cstiner@ahdootwolfson.com*
Rachel Johnson*
*rjohnson@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

Cornelius P. Dukelow*
Oklahoma Bar No. 19086
**ABINGTON COLE + ELLERY**
320 South Boston Avenue
Suite 1130
Tulsa, Oklahoma 74103
918.588.3400 (*telephone & facsimile*)
*cdukelow@abingtonlaw.com*
www.abingtonlaw.com

*\*pro hac vice* to be filed

*Counsel to Plaintiffs and the Proposed Class*