# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA
### PITTSBURGH DIVISION

| | |
|---|---|
| WILLIAM HANNUM, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE RETAIL EQUATION, INC., et al.,<br><br>Defendants. | Civil Action No. 2:21-cv-997<br><br>Hon. Cathy Bissoon |

**BRIEF IN SUPPORT OF DICK'S SPORTING GOODS, INC.'S
MOTION TO COMPEL ARBITRATION**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND....................................................................................1

      A.      Ms. Guevara's Alleged June 2020 Return Attempt .................................................1

      B.      Ms. Guevara Agreed to DSG's Terms of Use Before her June 2020 Return
            Attempt ....................................................................................................................2

          1.      Ms. Guevara Agreed to the Terms When Purchasing DSG Merchandise
               Online in July 2016.....................................................................................2

          2.      Ms. Guevara Was Put on Notice of Changes to the Terms in 2017 and
               Declined to Opt Out....................................................................................3

      C.      The 2017 and 2015 Terms Include an Arbitration Clause and Class Action
            Waiver, and Delegate Questions of Scope to the Arbitrator....................................4

      D.      The Privacy Policy Is Incorporated by Reference into the Terms ...........................6

III.    ARGUMENT............................................................................................................7

      A.      Plaintiff Entered Into Valid and Enforceable Arbitration Agreements with
            DSG.........................................................................................................................9

          1.      Ms. Guevara Agreed to Arbitrate by Assenting to the 2015 Terms ...............10

          2.      Ms. Guevara Assented to the Updated 2017 Terms ......................................12

      B.      The Parties Agreed that the Arbitrator Must Decide Whether the Dispute
            Falls Within the Scope of the Arbitration Agreement ...........................................15

          1.      The Arbitration Agreement Expressly Delegates Arbitrability to the
               Arbitrator..................................................................................................15

          2.      Incorporation of Arbitration Rules in the Terms Delegates Arbitrability
               to the Arbitrator.........................................................................................16

      C.      If the Court Assesses Arbitrability, Plaintiff's Claims are Subject to Binding
            Arbitration on an Individual Basis.........................................................................17

IV.     CONCLUSION.......................................................................................................19

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Cos., Inc. v. Dobson*,
   513 U.S. 265 (1995)........................................................................................................7

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)....................................................................................................7, 17

*Bethlehem Area Sch. Dist. v. Zhou*,
   No. 09-cv-03493, 2012 WL 930998 (E.D. Pa. Mar. 19, 2012) .................................13

*Black v. JP Morgan Chase & Co.*,
   No. 10-cv-848, 2011 WL 3940236 (W.D. Pa. Aug. 25, 2011)....................................18

*Buckeye Check Cashing, Inc. v. Cardegna*,
   546 U.S. 440 (2006)........................................................................................................7

*Century Indem. Co. v. Certain Underwriters at Lloyd's, London*,
   584 F.3d 513 (3d Cir. 2009)...........................................................................................9

*Circuit City Stores, Inc. v. Adams*,
   532 U.S. 105 (2001)........................................................................................................8

*Collins v. Mary Kay, Inc.*,
   874 F.3d 176 (3d Cir. 2017)...........................................................................................9

*Corsale v. Sperian Energy Corp.*,
   374 F. Supp. 3d 445 (W.D. Pa. 2019)......................................................................12, 14

*Coulter v. Experian Info. Sols., Inc.*,
   No. 20-cv-1814, 2021 WL 735726 (E.D. Pa. Feb. 25, 2021) ........................10, 11, 18

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985)........................................................................................................8

*First Options of Chi., Inc. v. Kaplan*,
   514 U.S. 938 (1995)........................................................................................................9

*Friday v. Amer. Oil Corp.*,
   No. 01-cv-1598, 2006 WL 897744 (W.D. Pa. Apr. 6, 2006) .......................................8

*Guidotti v. Legal Helpers Debt Resol., L.L.C.*,
   716 F.3d 764 (3d Cir. 2013)...........................................................................................8

*Hayes v. Kutty*,
    No. 1916 EDA 2016, 2017 WL 3208695 (Pa. Super. Ct. July 28, 2017)..................................9

*HealthPlanCRM, LLC v. AvMed, Inc.*,
    458 F. Supp. 3d 308 (W.D. Pa. Apr. 28, 2020)............................................................11, 12, 15

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    139 S. Ct. 524 (2019) .........................................................................................................15

*Klein v. Verizon Comms., Inc.*,
    No. 12-cv-00757, 2017 WL 5071306 (E.D. Va. Aug. 9, 2017) .......................................13, 14

*Kruzits v. Okuma Mach. Tool, Inc.*,
    40 F.3d 52 (3d Cir. 1994)....................................................................................................9

*Lloyd v. HOVENSA, LLC*,
    369 F.3d 263 (3d Cir. 2004).................................................................................................8

*Mayer v. Verizon N.J.*,
    No. 13-cv-3980 (FSH), 2014 WL 12789832 (D.N.J. May 6, 2014)...........................12, 13, 14

*Melo v. Zumper, Inc.*,
    439 F. Supp. 3d 683 (E.D. Va. 2020) ............................................................................9, 10, 11

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017)..................................................................................................10

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983).................................................................................................................17

*Mucciariello v. Viator, Inc.*,
    No. 18-cv-14444 (FLW), 2019 WL 4727896 (D.N.J. Sep. 27, 2019)...................................11

*New Prime Inc. v. Oliveira*,
    139 S. Ct. 532 (2019)...........................................................................................................8

*Peter v. DoorDash, Inc.*,
    445 F. Supp.3d 580 (N.D. Cal. 2020) ..................................................................................11

*Rent-A-Center, W., Inc. v. Jackson*,
    561 U.S. 63 (2010)...............................................................................................................15

*Richardson v. Coverall N. Am., Inc.*,
    811 F. App'x 100 (3d Cir. 2020) .........................................................................................16

*Schwartz v. Comcast Corp.*,
    256 F. App'x 515 (3d Cir. 2007) ..........................................................................................10

*Simeone v. Simeone*,
     581 A.2d 162 (Pa. 1990) ....................................................................................10

*Trippe Mfg. Co. v. Niles Audio Corp.*,
     401 F.3d 529 (3d Cir. 2005)..................................................................................8

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
     363 U.S. 574 (1960)..............................................................................................17

*Webber v. Uber Techs., Inc.*,
     No. 18-cv-1941 PSG-GJS, 2018 WL 10151934 (C.D. Cal. Sep. 5, 2018)..............13

**Statutes**

9 U.S.C. § 2................................................................................................................7

9 U.S.C. § 3.............................................................................................................7, 8

Federal Arbitration Act, 9 U.S.C. §§ 1–16 ....................................................7, 8, 9, 15

**Other Authorities**

AAA Consumer Arbitration Rule 14 ........................................................................16

JAMS Streamlined Arbitration Rules & Procedures Rule 8(b) ..................................16

Fed. R. Civ. P. 12(b)(6)..............................................................................................8

Fed. R. Civ. P. 56......................................................................................................8

## I.    INTRODUCTION

Plaintiff Susana Guevara—the only plaintiff with allegations involving DICK'S Sporting Goods, Inc. ("DSG")—agreed to arbitrate any dispute with DSG, including any dispute related to its collection, use, or transmission of customer information.  She did so at least twice, agreeing to arbitrate when she purchased merchandise on DSG's website on July 27, 2016, and then again when DSG sent her explicit notice of changes to the arbitration agreement and she declined to exercise a clear option to opt-out of the arbitration agreement.  Notwithstanding these clear commitments, Ms. Guevara filed the Class Action Complaint ("Complaint") on July 27, 2021, asserting a variety of claims—individually and on behalf of a putative class—on the basis that DSG transmitted her transaction and other information to Defendant The Retail Equation, Inc. ("TRE") during a June 2020 return in a DSG store.  Because a valid and enforceable agreement to arbitrate exists between DSG and Ms. Guevara, the Court must compel Ms. Guevara to arbitrate claims against DSG on an individual basis, including any claims asserted on behalf of a putative class, and should stay this action pending the completion of individual arbitration proceedings.

## II.    FACTUAL BACKGROUND

### A.    Ms. Guevara's Alleged June 2020 Return Attempt.

The Complaint alleges that Plaintiff Susana Guevara ("Plaintiff" or "Ms. Guevara"), a Virginia resident, "attempted to return or exchange merchandise previously purchased from Dick's Sporting Goods" in June 2020.  Dkt. 1 ¶ 89.  The sales associate entered Ms. Guevara's information—including her "transaction information"—into DSG's "computer system," which then allegedly transmitted that information to TRE to be used "by TRE to generate a 'risk score' for her from which TRE would then make a fraud determination and generate an approval or denial of the attempted return or exchange." *Id*. ¶¶ 90–91, 95–96.

1

The Complaint alleges that, after DSG transmitted Ms. Guevara's transaction information, TRE "communicated to [DSG's] sales associate that the attempted return or exchange was to be declined." *Id*. ¶ 96. Then, the sales associate allegedly "communicated to Plaintiff Guevara that the return or exchange was declined based upon the recommendation of TRE" and "presented Plaintiff Guevara a printout stating the return or exchange was declined" and with "contact information for TRE." *Id*. ¶¶ 97–98. Therefore, Ms. Guevara allegedly was "prevented from completing the return or exchange." *Id*. ¶ 99.

**B.    Ms. Guevara Agreed to DSG's Terms of Use Before her June 2020 Return Attempt.**

**1.    Ms. Guevara Agreed to the Terms When Purchasing DSG Merchandise Online in July 2016.**

On July 27, 2016, Ms. Guevara purchased merchandise on the desktop version of DSG's website, www.dickssportinggoods.com (the "Website"). Declaration of Erika E. Green ("Green Decl."), ¶ 2. To make that purchase, Ms. Guevara had to complete the Website's checkout flow process. *Id*. ¶ 3. After a customer selected their items for purchase, that process required them to select a "Begin Checkout" button and then prompted them to enter their payment and shipment information. *Id*. The final page of the checkout flow process, the "Order Review" page, required the customer to click the "Submit Order" button to complete the purchase. *Id*. Within the body of this web page, immediately below the order summary and adjacent to the "Submit Order" button, on the left side of the button, is language notifying the customer of important information regarding the impact of clicking the "Submit Order" button. *Id*., Ex. A. It says, in relevant part: "By placing your order, you affirm that you agree to our Terms and Conditions and Privacy Policy." *Id.*, ¶ 3. The phrases "Terms and Conditions" and "Privacy Policy" were set apart in green text and hyperlinked to the contents of DSG's Terms of Use ("Terms") or Privacy Policy, respectively. *Id*. Because Ms. Guevara had to click the "Submit Order" button to make her

2

purchase on July 27, 2016, *id*. ¶ 3, she agreed to the Terms in place at that time (the "2015 Terms")[1] when making her purchase.

### 2. Ms. Guevara Was Put on Notice of Changes to the Terms in 2017 and Declined to Opt Out.

The first numbered paragraph of the 2015 Terms provides: "DICK'S may revise these Terms at any time and from time to time by updating this posting, and such revisions shall be effective immediately upon being posted to the Site, however, any changes to the dispute resolution provisions set forth below will not apply to any disputes for which the parties have actual notice prior to the date the change is posted on the Site . . . Your continued use of the Site after any modifications indicates your acceptance of the these Terms, as modified." *Id.*, Ex. C at ECF Page 28.

On January 11, 2017, DSG sent an email to customers, including Ms. Guevara, notifying them of changes to the DSG Terms and their ability to opt out of the arbitration provision. *Id.*, ¶ 4; Declaration of Julie Salas ("Salas Decl."), ¶ 3. The short email, less than a page in length, directed customers' attention to two "key" changes to the Terms of Use and Privacy Policy, one of which was a "[r]evision of the arbitration agreement that explains how legal disputes are handled." Salas Decl., ¶¶ 4–5, Exs. A–B. The email further informed customers: "Under the terms of the arbitration provision, claims will be resolved by individual (and not class-wide) arbitration. The arbitration provision will apply to you unless you opt out by providing timely notice as set forth in the Terms of Use." *Id.*, ¶¶ 4–5, Exs. A–B. It also included blue hyperlinks to the contents of the Privacy Policy and Terms. Green Decl., ¶¶ 6–7.[2]

---

[1] The Terms in place on July 27, 2016 had an effective date of February 11, 2015. Green Decl., ¶ 7, Ex. C.

[2] Attached as Exhibit C to the Declaration of Erika E. Green is a copy of the Terms as they appeared to website users on January 11, 2017, which for the convenience of users showed both the older

DSG's records show that on multiple occasions between the transmission of the January 11, 2017 email referenced above and 2021, DSG sent emails to Plaintiff Guevara, and the user of that email account clicked on links within those emails to visit the DSG website and subsequently browsed on the DSG website. *Id*., ¶ 5. Ms. Guevara did not opt out of the arbitration provision after receiving that email and engaging in subsequent interactions with the DSG website. *Id*, ¶ 8.

The 2017 Terms, and specifically the arbitration provision, supersede prior agreements between the parties to the extent necessary to resolve inconsistencies or ambiguities between them. *Id*., Ex. C at ECF Page 45, ¶ 20(b).

**C.      The 2017 and 2015 Terms Include an Arbitration Clause and Class Action Waiver, and Delegate Questions of Scope to the Arbitrator.**

The 2017 Terms, provide, in relevant part, as follows:

Arbitration.

. . . [Y]ou and DICK'S each agree that any dispute, claim or controversy arising out of or relating to the Sites (including, without limitation, DICK'S digital operations at or through our websites, our mobile/tablet sites, our social media presence, our Scorecard program, our applications, and our stores/locations for each member of our Family of Businesses), or these Terms or the breach, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration before one arbitrator. The arbitration shall be administered by JAMS pursuant to JAMS' Streamlined Arbitration Rules and Procedures . . . By agreeing to arbitration, the parties understand and agree that they are waiving their rights to maintain other available resolution processes, such as a court action or administrative proceeding, to settle their disputes. We strive to offer a fundamentally-fair arbitration hearing process.

. . .

Waiver of Certain Rights from Court. The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court.

**Class Action Waiver.** The parties further agree that any arbitration shall be conducted in their individual capacities only and not as a class action or other representative action, and the parties

---

version of the Terms (effective date February 11, 2015) and the newer version (effective date February 12, 2017). *See* Green Decl., Ex. C.

expressly waive their right to file a class action or seek relief on a class basis. If any court or arbitrator determines that the class action waiver set forth in this paragraph is void or unenforceable for any reason or that an arbitration can proceed on a class basis, then the arbitration provision set forth above shall be deemed null and void in its entirety and the parties shall be deemed to have not agreed to arbitrate disputes.

. . .

30-Day Right to Opt-Out. You have the right to opt-out and not be bound by the arbitration and class action waiver provisions set forth in this Section 21 by sending written notice of your decision to opt-out to the following address via certified mail: Dick's Sporting Goods, Inc., 345 Court Street, Coraopolis, PA 15108, Attention: Legal Department. The notice must be sent within thirty (30) days of your first use of a Site after the effective date of these Terms, otherwise you shall be bound to arbitrate disputes in accordance with the terms of those Sections. If you opt-out of these arbitration provisions, DICK'S also will not be bound by them.

YOU AGREE THAT BY ENTERING INTO THESE TERMS, IN PARTICULAR THE AGREEMENT TO ARBITRATE, YOU ARE WAIVING THE RIGHT TO TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION AND THAT YOU MAY BRING CLAIMS AGAINST DICK'S ONLY IN YOUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. ANY ARBITRATION OR OTHER ACTION WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED. YOU ACKNOWLEDGE THAT BY ENTERING INTO THESE TERMS, YOU INTEND TO BE LEGALLY BOUND AND, IN ADDITION TO OTHER GOOD AND VALUABLE CONSIDERATION, YOU AGREE THAT DICK'S AGREEMENT TO ARBITRATE CLAIMS CONSTITUTES CONSIDERATION FOR SUCH WAIVER.

Green Decl., Ex. C at ECF Pages 45–47, ¶ 21 (emphasis in original).

The 2015 Terms similarly provide that:

[a]ny matter and/or dispute relating in any way to your visit to or interaction with the Site, including compliance with these Terms, shall be submitted to binding confidential arbitration in Pittsburgh, Pennsylvania . . . **conducted only on an individual basis and not as a class, consolidated, joined or representative action and the parties expressly waive all rights to commence or participate in any class, consolidated or representative action/proceeding. You agree that DICK'S agreement to arbitrate claims constitutes consideration for such waiver** . . . Arbitration under these Terms shall be conducted under the prevailing rules of the American Arbitration Association . . . In the event, for any reason, arbitration is not permitted by applicable law, the parties waive all rights to trial by jury and waive all right to commence or participate in any class action, consolidated, representative or class proceedings.

5

*Id.* at ECF Page 35, ¶¶ 20–21 (emphasis in original).  Moreover, as noted above, the 2015 Terms were subject to modifications.  *See id.*, Ex. C at ECF Page 28 ("DICK'S may revise these Terms at any time and from time to time by updating this posting").

Both the 2015 and 2017 Terms state they are to be "governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to any principles of conflicts of laws." *Id.* at ECF Pages 35, ¶ 20 and 45, ¶ 20(b).

### D.      The Privacy Policy Is Incorporated by Reference into the Terms.

The 2017 Terms "incorporate[] by reference" the publicly-posted DSG Privacy Policy, which "applies to information obtained in connection with DICK'S operations at or through our websites, our mobile/tablet sites, our social media presence, our applications, our stores, our kiosks, and other DICK'S owned or controlled digital and omni-channel properties that link to this Policy."[3] Green Decl., Ex. B at ECF Page 16. The Privacy Policy encompasses, inter alia, the types of information DSG may collect; how DSG uses this information, including to "[p]rotect[] the security and integrity of our stores, Websites, Internet Marketing Channels and overall business practices"; and when DSG discloses the information, including to "protect the rights, property or safety of DICK'S, our customers, our associates or others, to prevent harm or loss, or in connection with an investigation or suspected or actual unlawful activity."  *Id.* at ECF Pages 16–19, 21–23.[4]

---

[3] The 2015 Terms likewise "incorporate[] by reference" the Privacy Policy, and the Privacy Policy in effect from December 18, 2015 through February 11, 2017 contained the following materially identical provision as that contained in the Privacy Policy in effect beginning February 12, 2017: "This Policy applies to information obtained in connection with DICK'S operations at or through our websites, our mobile/tablet sites, our social media presence, our applications, our stores and other DICK'S controlled digital properties that link to this Policy."  Green Decl., Ex. B at ECF Page 9.

[4] The Privacy Policy in effect from December 18, 2015 through February 11, 2017 included materially identical provisions.  *See* Green Decl., Ex. B at 9–14.

## III.    ARGUMENT

Plaintiff entered into valid and enforceable agreements to arbitrate, by which she expressly agreed (i) to pursue her claims with DSG on an individual basis through arbitration rather than in court or on a class wide basis, and (ii) that an arbitrator, rather than a court, would address the scope and enforceability of the arbitration provision.  The Court should order Plaintiff to submit each of the claims she asserts to arbitration on an individual basis pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16.

The FAA applies to the arbitration agreement in the Terms, as a written contract evidencing a transaction involving interstate commerce. Ms. Guevara resides in Virginia, and DSG operates out of its Pennsylvania headquarters.  *See* 9 U.S.C. § 2 (extending to a written arbitration "provision in any . . . contract evidencing a transaction involving commerce"); Dkt. 1 ¶¶ 15, 88; Green Decl., Ex. C at ECF Pages 35, ¶¶ 20–21, and 45–47, ¶ 21; *see also Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 277 (1995) (concluding under the FAA "that the word 'involving,' like 'affecting,' signals an intent to exercise Congress' commerce power to the full"). The FAA reflects the well-established federal policy favoring arbitration and requires that arbitration agreements be rigorously enforced.  *See, e.g., AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 345 (2011); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  The FAA's central provision provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  If a lawsuit is brought "upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.

If one of the parties disregards a valid arbitration agreement, a court with jurisdiction over the litigation "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." *Id.* § 4.  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration" if it concludes that the parties have agreed to arbitrate the dispute.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original); *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001) (the FAA "compels judicial enforcement of . . . written arbitration agreements").  The court then shall stay the litigation pending conclusion of the arbitration.  9 U.S.C. §3; *Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004).

Under the FAA, courts must compel arbitration when (1) a valid agreement to arbitrate exists, and (2) the dispute falls within the scope of that agreement.  *See Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005).  Motions to compel arbitration are reviewed under a Rule 12(b)(6) standard when it is clear from the face of the complaint and documents relied upon therein that a plaintiff's claims are subject to an enforceable arbitration clause, and otherwise are subject to Rule 56's standard.  *See Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013).  Under that latter standard, a motion to compel arbitration should be granted where, as here, the evidence demonstrates that there is no genuine dispute of material fact that the parties entered into a valid arbitration agreement.  *See id.*  "Unless a party specifically challenges the validity of the agreement to arbitrate, both sides may be required to take all their disputes— including disputes about the validity of their broader contract—to arbitration."  *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 538 (2019).  And when a party does challenge an arbitration agreement, that party bears the burden of showing that the claims at issue are not subject to arbitration.  *Friday*

*v. Amer. Oil Corp.*, No. 01-cv-1598, 2006 WL 897744, at \*1 (W.D. Pa. Apr. 6, 2006) (citing *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91–92 (2000) (citation omitted)).

Because the Terms contain valid and enforceable arbitration agreements and delegate any questions about their scope or enforceability to the arbitrator, the FAA compels that these claims be submitted to arbitration.

**A.     Plaintiff Entered Into Valid and Enforceable Arbitration Agreements with DSG.**

Plaintiff entered into valid and enforceable arbitration agreements with DSG when she assented to the 2015 Terms as part of an online transaction with DSG in July 2016, and she again assented to the updated 2017 Terms by continuing to use DSG's website following those modifications.  Moreover, Plaintiff Guevara further assented to the updated 2017 Terms, including the arbitration provision, because DSG emailed her notice of those modified Terms and she continued to use DSG's website and never opted out of the arbitration provision.  To determine whether the parties validly entered into an agreement containing an arbitration clause, courts apply ordinary state-law principles governing contract formation. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  A contract exists where the parties mutually manifest assent to the terms of the agreement.  *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 533 (3d Cir. 2009) (applying Pennsylvania law).[5]  A party's "failure to read a contract does

---

[5] In diversity cases, federal courts "look to the choice-of law rules of the forum state," *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017), and Pennsylvania courts "generally . . . enforce choice of law provisions." *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994).  Because DSG's Terms contain a clear choice-of-law provision, *see* Green Decl., Ex. C at ECF Pages 35, ¶ 20 and 45, ¶ 20(b), the law of Pennsylvania governs Plaintiff's claims.  However, the Court need not resolve any choice of law issues because the outcome of this motion is the same under the law of Pennsylvania or Virginia (Ms. Guevara's state of residence, Dkt. 1 ¶ 88): an agreement containing an arbitration clause exists between Ms. Guevara and DSG.  *See Hayes v. Kutty*, No. 1916 EDA 2016, 2017 WL 3208695, at \*4 (Pa. Super. Ct. July 28, 2017) (a binding contract was created where there was "offer, acceptance and consideration"); *Melo v. Zumper, Inc.*,

not excuse a party from being bound by its terms." *Schwartz v. Comcast Corp.*, 256 F. App'x 515, 520 (3d Cir. 2007); *see also Simeone v. Simeone*, 581 A.2d 162, 165-66 (Pa. 1990) ("Contracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains."). Because Plaintiff manifested assent to both the 2015 and 2017 Terms, her claims are subject to arbitration.

### 1. Ms. Guevara Agreed to Arbitrate by Assenting to the 2015 Terms.

A contract to arbitrate existed between Ms. Guevara and DSG because she had notice of and agreed to DSG's 2015 Terms, including the arbitration provision therein, when she affirmatively clicked the "Submit Order" button to complete a purchase on DSG's website in July 2016, which sat directly next to a clear notice indicating that by placing an order she agreed to the hyperlinked Terms. A user's click can constitute valid assent to an agreement, including as part of online transactions.[6] *See Coulter v. Experian Info. Sols., Inc.*, No. 20-cv-1814, 2021 WL 735726, at *5 (E.D. Pa. Feb. 25, 2021). Courts in this circuit and around the country routinely enforce such agreements where, as here, plaintiff manifests assent in making an online purchase after receiving reasonable notice of the terms. *See, e.g., Meyer*, 868 F.3d at 79-80 (plaintiff manifests assent to Terms where a reasonably prudent user would be on notice of the terms in engaging in an online transaction); *Coulter*, 2021 WL 735726, at *5 (enforcing Terms "when

---

439 F. Supp. 3d 683, 696 (E.D. Va. 2020) ("Under Virginia law, offer, acceptance and consideration must exist to form a valid contract.").

[6] *See also Melo*, 439 F. Supp. 3d at 697 (courts have "'recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract,' and that '[t]here is nothing automatically offensive about such agreements, as long as the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement'") (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).

Defendant's website advised Plaintiff that '[b]y clicking 'Submit Secure Order': [He] accept[s] and agree[s] to [their] Terms of Use Agreement"); *HealthPlanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 330-31 (W.D. Pa. Apr. 28, 2020) (enforcing agreement where a statement below the log-in box read "Use of [site] constitutes acceptance of the [hyperlinked] End User License Agreement"); *Melo*, 439 F. Supp. 3d at 699 ("[w]hen Plaintiff clicked the 'Create Account' button, he manifested assent to the Agreement" viewable as a hyperlink on the same page); *Mucciariello v. Viator, Inc.*, No. 18-cv-14444 (FLW), 2019 WL 4727896, at *4-7 (D.N.J. Sep. 27, 2019) (concluding plaintiff agreed to terms by clicking on a "Book Now" icon, which was next to a message that read "[b]y clicking Book Now and making a reservation, I acknowledge that I have read and agree to be bound by Viator's Terms and Conditions and Privacy Statement"); *Peter v. DoorDash, Inc.,* 445 F. Supp.3d 580, 586-87 (N.D. Cal. 2020).

It is clear that Plaintiff Guevara and DSG entered into an agreement to arbitrate when she clicked the "Submit Order" button to complete her July 2016 purchase, and she had reasonable notice that doing so would constitute assent to the 2015 Terms. Indeed, courts have enforced similar click-based agreements in cases in which notice of the impact of proceeding with the click-based assent was similarly or less prominent than that here. For instance, in *Coulter v. Experian Information Solutions, Inc.*, plaintiff was provided reasonable notice because he was advised that "[b]y clicking 'Submit Secure Order': [He] accept[s] and agree[s] to [their] Terms of Use Agreement." 2021 WL 735726, at *5. Just as in *Coulter*, DSG's Terms were expressly referenced and hyperlinked in a disclosure located directly next to the "Submit Order" button, which unequivocally stated (in contrasting-color text) that "[b]y placing your order, you affirm that you agree to our Terms and Conditions and Privacy Policy." Green Decl., Ex. A. Similarly, in *HealthplanCRM, LLC v. AvMed, Inc.*, an online agreement was enforceable because plaintiff

11

placed "an explicit warning directly below the log-in button" with blue hyperlinks to an agreement against a white background indicating that "use" of the software "constitutes acceptance" of the agreement; such a warning had "a similar psychological effect" as clickwrap agreements because it avoided concerns about notice and assent.  458 F. Supp. 3d at 334.  As in *HealthplanCRM, LLC*, DSG's straightforward disclosure located directly next to the "Submit Order" button, with hyperlinks in green text against a white background, offered a clear and conspicuous notice to Plaintiff that clicking the button constituted her agreement to DSG's Terms.  For these reasons, Ms. Guevara agreed to the arbitration agreement in the 2015 Terms.

### 2.   Ms. Guevara Assented to the Updated 2017 Terms.

Ms. Guevara also assented to DSG's updated 2017 Terms.  The 2015 Terms made clear that they were subject to modifications and that her continued use of DSG's website constituted assent to the modified Terms.  Ms. Guevara continued to use DSG's website after updates were made, and was thus bound by the updated Terms. Green Decl. ¶ 5; *see Mayer v. Verizon N.J.*, No. 13-cv-3980 (FSH), 2014 WL 12789832, at *2 (D.N.J. May 6, 2014) (finding plaintiff's claims subject to amended arbitration provision where plaintiff was notified that terms could be updated by posting on website).  Further, she assented to the 2017 Terms for the additional reason that DSG sent her an email in January 2017 highlighting "key changes" to its Terms that made clear that the updated arbitration provision applied to her unless she opted out, and there is no record that she did so.  *See* Salas Decl., ¶¶ 4–5, Exs. A–B; Green Decl., ¶ 8.  She thus agreed to be bound by those updates.  A party is bound by changes or updates to terms when she fails to opt out or continues to use a service despite notice that such an action constitutes agreement to the terms. *Corsale v. Sperian Energy Corp.*, 374 F. Supp. 3d 445, 454-55 (W.D. Pa. 2019) (enforcing updated terms against consumer under Pennsylvania law where customer remained silent upon receiving

12

notice of change in terms and declined to opt out).[7]  In particular, courts have determined that when individuals receive an email notifying them of updates to a company's terms, continued use of that company's service or product constitutes assent to the updated terms.  *See Webber v. Uber Techs., Inc.*, No. 18-cv-1941 PSG-GJS, 2018 WL 10151934, at *4 (C.D. Cal. Sep. 5, 2018) (finding updated terms were enforceable where plaintiffs continued using Uber after "receiv[ing] an email . . . notifying [them] that Uber's Terms had been updated, and that continued use of the service would constitute assent to those Terms") (citing *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016)); *Klein v. Verizon Comms., Inc.*, No. 12-cv-00757 (GBL/IDD), 2017 WL 5071306, at *5 (E.D. Va. Aug. 9, 2017) (concluding plaintiff accepted contract modification where Verizon emailed the modification and plaintiff "continued [to] use [] Verizon's services"); *Mayer*, 2014 WL 12789832, at *2 (finding plaintiff was validly notified of changes to arbitration provision via email and Verizon's website, and continued to use FiOS services).

Here, Ms. Guevara had notice of the update to the arbitration agreement in the 2017 Terms. The 2015 Terms informed Ms. Guevara that they may be modified in the future and would be posted to the DSG website, and that "continued use of the Site after any modifications indicates your acceptance" of the Terms, as modified. Green Decl., Ex. C at ECF Page 28, ¶ 1.  Consistent with that message, on January 11, 2017, DSG sent an email to two different email addresses associated with Plaintiff that informed her that DSG "made some updates to our Privacy Policy and Terms of Use."  Salas Decl., ¶¶ 4–5, Exs. A–B; Green Decl., ¶ 4.  Specifically, the email

---

[7] Mutual agreements to arbitrate can serve as the additional consideration necessary to modify a contract. *See Bethlehem Area Sch. Dist. v. Zhou*, No. 09-cv-03493, 2012 WL 930998, at *2 n.2 (E.D. Pa. Mar. 19, 2012) (mutual agreements to arbitrate are valid consideration supporting a contract under Pennsylvania law).

highlighted that "key changes" included "[r]evision of the arbitration agreement that explains how legal disputes are handled," noting that "claims will be resolved by individual (and not class-wide) arbitration" and "will apply to you unless you opt out by providing timely notice as set forth in the Terms of Use."  Salas Decl., ¶¶ 4–5, Exs. A–B.  Immediately following this language was a blue hyperlink to the Terms, which if clicked, would take Plaintiff to the full contents of both the 2015 Terms and the 2017 Terms with a clear description of each version's effective dates and a bolded instruction at the top to "**see below for updated Terms of Use**." Green Decl., ¶ 7; *id.*, Ex. C at ECF Page 28.  Near the top of the 2017 Terms was a "***Notice Regarding Dispute Resolution***" that, like the January 2017 email, reiterated that the arbitration agreement in Section 21 "***require[s] you to submit claims you have against us to binding arbitration, unless you opt-out in accordance with Section 21***." Green Decl,, Ex. C, at ECF Page 36 (emphasis in original).  Section 21 of the updated Terms contained specific guidance for how Plaintiff could opt out of the arbitration agreement within 30 days of their "first use of a Site after the effective date of these Terms" to avoid being bound to that agreement.  *Id.* at ECF Page 47.

DSG's records show that on multiple occasions between the transmission of the January 11, 2017 email referenced above and 2021, DSG sent emails to Ms. Guevara's email addresses, the user of those email addresses clicked on links within those emails that brought the user to the DSG website, and the user subsequently browsed on the DSG website.  *Id.* ¶ 5.  Moreover, DSG has no record that she opted out of the arbitration provision contained in the 2017 Terms.  *Id.* ¶ 8. For these reasons, she is bound by the arbitration agreement.  *See Corsale*, 374 F. Supp. 3d at 454–55; *Klein.*, 2017 WL 5071306, at *5; *Mayer*, 2014 WL 12789832, at *2.

14

**B.**     **The Parties Agreed that the Arbitrator Must Decide Whether the Dispute Falls Within the Scope of the Arbitration Agreement.**

Plaintiff may dispute whether the Complaint against DSG falls within the scope of the arbitration agreement, or make some other challenge to the enforceability of the agreement.  Any such issues are for the arbitrator to decide.  FAA case law makes clear that where there is silence on scope of an arbitration agreement, a court decides whether a particular claim falls within its scope, but where the parties clearly delegate questions of enforceability and scope to the arbitrator, courts must enforce that delegation.  *See HealthplanCRM, LLC*, 458 F. Supp. 3d at 322 (citing *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 335 (3d Cir. 2014)); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (contracting parties "may agree to have an arbitrator decide…gateway questions of arbitrability" and when they have done so, "a court may not override the contract").  "In those circumstances, a court possesses no power to decide the arbitrability issue . . . even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."  *Henry Schein*, 139 S. Ct. at 529.  Here, the issue of the arbitration provision's scope and enforceability is clearly delegated to the arbitrator because the arbitration agreement delegates arbitrability to the arbitrator and incorporates the JAMS rules that delegate arbitrability to the arbitrator.

**1.**     **The Arbitration Agreement Expressly Delegates Arbitrability to the Arbitrator.**

The plain language of the arbitration provision in the 2017 Terms expressly delegates arbitrability.  The agreement clearly states that "you and DICK'S each agree that . . . the breach, enforcement, interpretation or validity [of these Terms], including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration before one arbitrator."  Green Decl., Ex. C at ECF Page 45, ¶ 21.  This is the quintessential example of a clear and unmistakable delegation provision and is routinely enforced.  *See Rent-A-Center, W.,*

15

*Inc. v. Jackson*, 561 U.S. 63, 66, 72 (2010) (enforcing similar delegation provision). Ms. Guevara thus expressly agreed to delegate arbitrability and scope to the arbitrator when agreeing to the Terms.

### 2. Incorporation of Arbitration Rules in the Terms Delegates Arbitrability to the Arbitrator.

The parties also agreed to delegate arbitrability to the arbitrator by incorporating the JAMS Rules into the 2017 Terms. *See* Green Decl., Ex. C at ECF Page 45, ¶ 21. The JAMS Rules provide that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought . . . shall be submitted to and ruled on by the Arbitrator." JAMS Streamlined Arbitration Rules & Procedures, Rule 8(b), *available at* https://www.jamsadr.com/rules-streamlined-arbitration/. Even if the 2015 Terms were to apply, those Terms called for arbitration under the AAA Rules, Green Decl., Ex. C at ECF Page 35, ¶ 21, which also require the arbitrator, rather than the court, to address any challenges related to the scope or enforceability of the arbitration clause. *See* AAA Consumer Arbitration Rules, Rule 14, *available at* https://www.adr.org/sites/default/files/Consumer-Rules-Web.pdf. Incorporation of arbitration rules that themselves reserve the question of arbitrability for the arbitrator "constitutes 'clear and unmistakable' evidence of the parties' intent [to delegate arbitrability]." *Richardson v. Coverall N. Am., Inc.*, 811 F. App'x 100, 104 (3d Cir. 2020) (quoting *Brennan v. Opus Bank*, 796 F.3d 1125, 1130-31 (9th Cir. 2015)). Here, by incorporating the specific JAMS Streamlined Arbitration Rules and Procedures into the arbitration provision in the 2017 Terms (and, under the 2015 Terms, the AAA Rules), and providing that these rules "shall" govern an arbitration, the parties once again clearly and unmistakably delegated the issue of arbitrability, or scope, to the arbitrator. Accordingly, the Court's inquiry ends here. This case

16

must be compelled to arbitration in the first instance, where the arbitrator will decide arbitrability if Ms. Guevara challenges it.

**C.      If the Court Assesses Arbitrability, Plaintiff's Claims are Subject to Binding Arbitration on an Individual Basis.**

For the reasons explained above, the arbitrator rather than the Court should assess any challenges to the enforceability or scope of the arbitration agreement.  However, if the Court were to assess these issues, courts must indulge every presumption "in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-85 (1960) (holding that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute[,]" any "[d]oubts should be resolved in favor of coverage[,]" and, "[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail").

In applying these standards, courts hold that agreements requiring arbitration of "[a]ny dispute, claim or controversy arising out of or relating to this Agreement" is broad and presumptively covers all disputes between the parties. *Concepcion*, 563 U.S. at 336 (enforcing arbitration agreement governing "all" disputes).  Here, the arbitration provision has just such a provision requiring binding arbitration of "*any* dispute, claim or controversy arising out of or relating to the Sites."[8]  Green Decl., Ex. C at ECF Page 45, ¶ 21 (emphasis added).  Moreover, it gives examples of the types of disputes this could entail by "including, without limitation," disputes "arising out of or relating to . . . DICK'S digital operations at or through our websites . . .

---

[8] Likewise, the 2015 Terms require binding arbitration as to "[a]ny matter and/or dispute relating in any way to your visit to or interaction with the Site." Green Decl., Ex. C at ECF Page 35, ¶ 20.

17

and our stores/locations." *Id.*  This language has been repeatedly found to be "of the broadest nature" encompassing all disputes between the parties.  *Black v. JP Morgan Chase & Co.*, No. 10-cv-848, 2011 WL 3940236, at *6 (W.D. Pa. Aug. 25, 2011).

The Terms also "incorporate[] by reference" the Privacy Policy, which "applies to information obtained in connection with DICK'S operations at or through our websites, our mobile/tablet sites, our social media presence, our applications, our stores, our kiosks, and other DICK'S owned or controlled digital and omni-channel properties that link to this Policy."[9] Green Decl., Ex. B at ECF Page 16.  It encompasses, *inter alia*, the types of information DSG may collect, how DSG uses this information, and to whom it discloses the information.  *Id*. at ECF Pages 16–19, 21–23.  These practices form the basis of Ms. Guevara's claims (Dkt. 15 ¶¶ 88–99)—claims that clearly relate to the Terms.  *See Black*, 2011 WL 3940236, at *6 (concluding antitrust claims fell within the scope of a broad arbitration provision governing "any" disputes, where claims were based on allegations that defendant "share[d] her financial information with other defendants" and the agreement's "privacy provision . . . specifically contemplate[d] and expressly permit[ted] the sharing of Plaintiffs account information with others").

Finally, because the Terms contained a clear class action waiver and stated that any dispute must be conducted on an individual basis, Green Decl, Ex. C at ECF Pages 35, ¶ 20, and 46, ¶ 21, Plaintiff may only bring her claims against DSG on an individual basis.  *See Coulter*, 2021 WL 73726, at *5.

---

[9] The 2015 Terms likewise "incorporate[] by reference" the Privacy Policy, Green Decl., Ex. C at ECF Page 29, and the Privacy Policy in effect from December 18, 2015 through February 11, 2017 contained a materially identical provision as that contained in the Privacy Policy in effect beginning February 12, 2017. *See supra*, n.3.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, DSG respectfully requests that the Court issue an order granting the Motion, compelling arbitration of Counts One, Three, and Five in the Complaint to the extent those claims are stated by Ms. Guevara and the putative class against DSG, and to stay this action pending the completion of individual arbitration proceedings.

Dated: January 3, 2022

/s/ *Jasmeet K. Ahuja*

Jasmeet K. Ahuja (PA 322093)
jasmeet.ahuja@hoganlovells.com
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel:  (267) 675-4600
Fax:  (267) 675-4601

Michelle A. Kisloff (DC 477775) (*pro hac vice*)
michelle.kisloff@hoganlovells.com
Joseph J. Cavanaugh (DC 1616917)
joe.cavanaugh@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Tel:  (202) 637-5600
Fax:  (202) 637-5910

19