# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| WILLIAM HANNUM, SEAN FREDERICK, OLGA MARYAMCHIK, VICTORIA CARUSO-DAVIS, SUSANA GUEVARA, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>THE RETAIL EQUATION, INC., APPRISS INC., ADVANCE AUTO PARTS, INC., ADVANCE STORES COMPANY, INCORPORATED, BEST BUY CO., INC., BEST BUY PURCHASING LLC, BEST BUY STORES, L.P., BUY BUY BABY, INC., CALERES, INC., BG RETAIL, LLC, and DICK'S SPORTING GOODS, INC.,<br><br>          Defendants. | Civil Action No. 2:21-CV-00997-CB |

**PLAINTIFF SUSANA GUEVARA'S OPPOSITION TO DEFENDANT DICK'S SPORTING GOODS, INC.'S MOTION TO COMPEL ARBITRATION**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND ......................................................................................................... 2

III.    THE MOTION'S EVIDENTIARY RECORD .......................................................... 3

        A.      The July 27, 2016 Online Purchase – The Only Purchase DSG Documents –
                Did Not Provide Notice of Arbitration ...................................................... 3

        B.      The Alleged 2017 Email Did Not Provide Sufficient Notice of Terms And
                There Is No Evidence Of Assent ................................................................ 5

        C.      The Scope Of The Arbitration Clauses Applies Only To Use Of The Website,
                Not A Return Attempted To Be Made In-Store ......................................... 7

IV.     APPLICABLE LEGAL STANDARDS ..................................................................... 8

V.      ARGUMENT .............................................................................................................. 10

        A.      No Arbitration Contract Was Formed ..................................................... 10

                1.      Plaintiff Did Not Consent to Arbitration Under the 2015 ToU ................ 10

                2.      Plaintiff Did Not Consent to Arbitration Under the 2017 ToU ............... 15

                3.      That Plaintiff Did Not Opt Out of Arbitration Does Not Indicate
                        Manifestation of Assent to Arbitrate ....................................................... 17

        B.      DSG's Arbitration Clause Does Not Cover Plaintiff's Claims ............................ 18

VI.     CONCLUSION ........................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Lewandowski v. Megabus USA, LLC,*
No. 2:20-CV-241, 2020 WL 2486653 (W.D. Pa. May 14, 2020) ............................................ 15

*Acme Markets, Inc. v. Int'l Ass'n of Machinists and Aerospace workers, Local Lodge No. 724,*
506 F. Supp. 92 (E.D. Pa. 1980) ......................................................................................... 18

*Alexander v. Anthony Int'l., L.P.,*
341 F.3d 256 (3d Cir. 2003) .................................................................................................. 8

*Am. Eagle Outfitters v. Lyle & Scott Ltd.,*
584 F.3d 575 (3d Cir. 2009) ................................................................................................ 10

*Applebaum v. Lyft, Inc.,*
263 F. Supp. 3d 454 (S.D.N.Y. 2017) ................................................................................. 14

*Beach v. U.S.,*
226 U.S. 243 (1912) ............................................................................................................ 18

*Blair v. Scott Specialty Gases,*
283 F.3d 595 (3d Cir. 2002) .................................................................................................. 9

*Bush v. Comcast Cable Commc'ns Mgmt., LLC,*
No. 2:19-CV-01004, 2020 WL 4199077 (W.D. Pa. July 22, 2020) ...................................... 14

*Century Indem. Co. v. Certain Underwriters at Lloyd's, London, Subscribing to Retrocessional Agreement Nos. 950548, 950549, 950546,*
584 F.3d 513 (3d Cir. 2009) .................................................................................................. 8

*Cullinane v. Uber Techs., Inc.,*
893 F.3d 53 (1st Cir. 2018) ................................................................................................. 14

*Emmaus Mun. Auth. v. Eltz,*
204 A.2d 926 (Pa. 1964) ....................................................................................................... 9

*First Options of Chicago, Inc. v. Kaplan,*
514 U.S. 938 (1995) ............................................................................................................... 9

*Gay v. CreditInform,*
511 F.3d 369 (3d Cir. 2007) .................................................................................................. 9

*Goldstein Depository Trust Co.,*
717 A.2d 1063 (Pa. Super. Ct. 1998) .................................................................................... 9

*Granite Rock Co. v. Int'l Bd. of Teamsters,*
561 U.S. 287 (2010) ........................................................................................................... 8, 9

*Greenspun v. American Adhesives, Inc.,*
320 F. Supp. 442 (E.D. Pa. 1970) ....................................................................................... 11

*HealthplanCRM, LLC v. AvMed, Inc.*,
   458 F. Supp. 3d 308 (W.D. Pa. 2020) .................................................................. 10, 13

*I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko,"*
   397 F. Supp. 3d 721 (E.D. Pa. 2019) ........................................................................ 15

*In re Carbone*,
   626 B.R. 262 (Brnkr. E.D. Pa. 2021) ................................................................. 10, 11

*Kirleis v. Dickie, McCamey & Chilcote, P.C.*,
   560 F.3d 156 (3d Cir. 2009) ............................................................................ 8, 9, 18

*Matreale v. New Jersey Dep't of Military & Veterans Affairs*,
   487 F.3d 150 (3d Cir. 2007) ...................................................................................... 8

*Meyer v. Uber Techs. Inc.*,
   868 F.3d 66 (2d Cir. 2017) ...................................................................................... 10

*Miracle-Pond v. Shutterfly, Inc.*,
   No. 19-CV-04722, 2020 WL 2513099 (N.D. Ill. May 15, 2020) ............................. 16

*Moscatiello v. Pittsburgh Contractors Equipment Co.*,
   595 A.2d 1190 (Pa. Super. Ct. 1991) ....................................................................... 11

*Nguyen v. Barnes & Noble, Inc.*,
   No. 8:12–cv–0812, 2012 WL 3711081 (C.D. Cal. 2012) ......................................... 13

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016) .............................................................................. 14, 15

*Noble v. Samsung Electronics Am., Inc.*,
   682 F. App'x 113 (3d Cir. 2017) .............................................................................. 11

*Norcia v. Samsung Telecomms. Am., LLC*,
   845 F.3d 1279 (9th Cir. 2017) .......................................................................... 11, 12

*Oak Street Printery, LLC, v. Fujifilm North Am. Corp.*,
   895 F. Supp. 2d 613 (M.D. Pa. 2012) ...................................................................... 11

*Peter v. DoorDash, Inc.*,
   445 F. Supp. 3d 580 (N.D. Cal. 2020) ..................................................................... 10

*Quiles v. Fin. Exch. Co.*,
   879 A.2d 281 (Pa. Super. Ct. 2005) ..................................................................... 8, 15

*Rodman v. Safeway Inc.*,
   125 F. Supp. 3d 922, 926 (N.D. Cal. 2015) ............................................................. 16

*Ryan v. Temple Univ.*,
   535 F. Supp. 3d 356 (E.D. Pa. 2021) ....................................................................... 10

*Sacchi v. Verizon Online LLC*,
   No. 14-CV-423-RA, 2015 WL 765940 (S.D.N.Y. Feb. 23, 2015) ........................... 16

*Schwartz v. Comcast Corp.*,
   256 F. App'x 515 (3rd Cir. 2007) ............................................................................. 15

*Southeastern Penn. Transp. Auth. v. Transit Cas. Co.*,
  412 F. Supp. 839 (E.D. Pa. 1976) .................................................................... 17

*Specht v. Netscape Commc'n Corp.*,
  306 F.3d 17 (2d Cir. 2002) ...................................................................... 11, 15

*Starke v. SquareTrade, Inc.*,
  913 F.3d 279 (2d Cir. 2019) .......................................................................... 14

*Trippe Mfg. Co. v. Niles Audio Corp.*,
  401 F.3d 529 (3d Cir. 2005) ............................................................................ 8

*United Steelworkers of America v. Warrior & Gulf Nav. Co.*,
  363 U.S. 574 (1960) ......................................................................................... 8

*Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*,
  489 U.S. 468 (1989) ......................................................................................... 9

*Wilson v. Huuuge, Inc.*,
  944 F.3d 1212 (9th Cir. 2019) ...................................................................... 14

*Woodside v. Sch. Dist. of Phila. Bd. of Educ.*,
  248 F.3d 129 (3d Cir. 2001) ............................................................................ 8

*Zabokritsky v. JetSmarter, Inc.*,
  No. CV 19-273, 2019 WL 2563738 (E.D. Pa. June 20, 2019) ...................... 14

## Statutes

13 Pa.C.S.A. § 1201 ......................................................................................... 11

## Other Authorities

RESTATEMENT (SECOND) OF CONTRACTS
  § 17 ................................................................................................................. 10

## I.   INTRODUCTION

Dick's Sporting Goods, Inc.'s ("DSG") Motion to Compel Individual Arbitration and to Dismiss (the "Motion") (ECF No. 63) fails for multiple reasons. First, no arbitration agreement was formed because Plaintiff Susana Guevara ("Plaintiff" or "Ms. Guevara") did not have actual or constructive notice of DSG's 2015 Terms of Use ("ToU") and the arbitration clause therein when she made her purchase on July 27, 2016, and therefore, never agreed to arbitration. The appearance of the check-out page was not designed to put a reasonable consumer on notice that, by clicking either of the two "Submit Order" buttons on DSG's website, she was agreeing to arbitrate her claims.

Second, DSG fails to meet its burden to establish that Plaintiff received DSG's 2017 email, that the 2017 email constituted adequate notice of DSG's amended ToU, or that the 2017 ToU provided adequate notice of the arbitration requirement. Starkly missing from DSG's Motion is any evidence that the 2017 email was received or opened, or evidence of lack of a bounce-back. DSG submitted a vague declaration from its Project Manager, Erika E. Green ("Green Decl."), indicating that DSG "maintains records of certain activity associated with some customer emails and some customer browsing activity." Green Decl., ¶ 5. Ms. Green continues that "DSG's records show that on multiple occasions between the transmission of the January 11, 2017 email referenced above and 2021, DSG sent emails to Ms. Guevara's aforementioned email addresses, the user of those email addresses clicked on links within those emails that brought the user to the DSG website, and the user subsequently browsed on the DSG website." *Id*. Notably absent from Ms. Green's declaration is any of DSG's "records." In the absence of any actual records, Ms. Green's declaration is nothing more than self-serving, unsubstantiated hearsay. And in the absence of documentary evidence, Ms. Green's declaration should be viewed with suspicion and construed against DSG. Thus, even if DSG argues that Ms. Guevara received and opened the 2017 DSG email, DSG fails to provide evidence that she ever used the DSG website after receiving the email or engaged in any other activity indicating her assent to the amended ToU.

Finally, even if Ms. Guevara is somehow held to have assented to DSG's ToU, the dispute between her and DSG relating to DSG's transmission of her data to Defendant The Retail Equation

("TRE") is not within the scope of the arbitration agreement. The arbitration clause in the 2015 ToU covers only disputes, claims or controversy *arising out of or relating to the customer's use of DSG's websites.* The arbitration provision in DSG's 2017 ToU is similarly limited to "any dispute, claim or controversy arising out of or relating to the Sites." Plaintiff's claims against DSG in this action are wholly unrelated to her use of DSG's websites but, rather, arise from her attempt to return or exchange merchandise in 2020 in a brick-and-mortar DSG store. Thus, by its plain language, the arbitration provision in DSG's ToU does not cover Plaintiff's claims.

DSG's Motion to Compel Arbitration should be denied in its entirety.

## II.    BACKGROUND

DSG is a sporting goods retailer with approximately 950 locations in the United States, approximately 38 of which are located in Pennsylvania. Complaint (ECF No. 1) ("Compl.") ¶ 15. At some or all of these stores, DSG utilizes services and information provided by TRE to determine, *inter alia*, whether to accept or reject merchandise returns and exchanges from DSG's individual customers at the time the customer attempts to make the return or exchange. TRE claims to "use[] statistical modeling and analytics to detect fraudulent and abusive behavior when returns are processed at retailers' return counters." *Id*. ¶ 16. As part of its contractual relationship with TRE, DSG collects large amounts of data about its customers, including details of customers' shopping, purchase, and payment histories as well as unique personal identification information such as name, date of birth, race, sex, full address, and pictures from government-issued photo IDs. *Id*. ¶¶ 21-23. DSG then shares the collected information with TRE without the customers' knowledge or consent. *Id*. ¶ 24.

Plaintiff alleges that, without her knowledge or consent, DSG transmitted to Defendant The Retail Equation, Inc. ("TRE") certain information pertaining to a merchandise return or exchange that she attempted to make, in person, at a DSG Store in June 2020, and that her return or exchange was then declined by DSG based upon the recommendation of TRE. *Id*. ¶¶ 89-99. Plaintiff alleges that DSG's provision of her personal data to TRE and/or DSG's denial of her merchandise return or exchange: (i) constituted an unlawful invasion of privacy under the common law; (ii) violated

Section 201-1, *et seq.* of the Pennsylvania Unfair Trade Practices and Consumer Protection Law; and (iii) resulted in the unjust enrichment of DSG. Compl. ¶¶ 113-19, 128-41, 155-61.

## III.    THE MOTION'S EVIDENTIARY RECORD

### A.    The July 27, 2016 Online Purchase – The Only Purchase DSG Documents – Did Not Provide Notice of Arbitration

According to the Declaration of DSG employee Erika E. Green ("Green Decl.") (ECF No. 63-1), DSG records "show that Ms. Guevara made an online purchase from the desktop version of DSG's website located at www.dickssportinggoods.com (the "Website") on July 27, 2016*." Id*. ¶ 2. Plaintiff's July 27, 2016 online purchase is the only transaction documented by DSG, notwithstanding Ms. Green's claim that that "DSG has located records of at least some of Ms. Guevara's purchases from DSG" and that "[Ms. Green] ha[s] reviewed those records." *Id.*[1]

Ms. Green states that, in order for Plaintiff to complete her July 27, 2016, purchase, DSG's "checkout flow process" required her to "select the 'Submit Order' button," and that "the statement '[b]y placing your order, you affirm that you agree to our Terms and Conditions and Privacy Policy' appeared adjacent to the 'Submit Order' button, on the left side of the button." She further states that "[a] true and correct copy of an exemplar of the final screen in the 'checkout flow' process as it

---

[1] The Green Declaration is rife with evidentiary gaps and outright inaccuracies that render it unreliable and inadmissible. For example, Ms. Green provides no copy of the DSG records she purportedly "reviewed" showing Plaintiff's July 27, 2016 purchase. Green Decl., ¶ 2. She fails to provide even a description of those records or explain how or by whom those records were prepared for her review. Ms. Green also states that Exhibit A to her declaration is a copy of "[t]he final page of the checkout flow process" that Plaintiff would have been required to follow in 2016. *Id.* ¶ 3. Thus, Ms. Green admits cherry-picking one page of the multi-page checkout flow process. Moreover, Ms. Green's description of Exhibit A as the "final page of the checkout flow process" is obviously inaccurate: first, the page contains numerous links to other pages that could be viewed after Exhibit A; second, the button labeled "Submit Order >" would presumably have brought the user to a subsequent page in the checkout flow process. In addition, Ms. Green refers to "DSG records" purportedly showing that "on multiple occasions" between transmission of the January 11, 2017 email and 2021, the user of Ms. Guevara's email addresses clicked on links in the emails and browsed the DSG website. *Id.* ¶ 5. Yet, Ms. Green provides no copies of the alleged "records." In sum, the Green Declaration is inaccurate, incomplete and misleading and has not been subjected to any form of scrutiny or verification by Plaintiff. For these reasons, the Green Declaration should be disregarded by the Court in its entirety. *See* Evidentiary Objection.

would have appeared on July 27, 2016 on the desktop version of the Website is attached" as Exhibit A to the Green Declaration.[2] Green Decl., ¶ 3.

In fact, there are two "Submit Order" buttons shown on Exhibit A. The first, which the Green Declaration ignores, is in the middle of the page, nowhere near the reference to ToU at the bottom of the page. It appears that the reference to the ToU would not even have appeared on Plaintiff's screen if she used the first "Submit Order" button. And, contrary to the assertions of Ms. Green and DSG, the statement, "By placing your order, you affirm that you agree to our Terms and Conditions and Privacy Policy" did not appear "*adjacent to*" the second "Submit Order" button. The layout of the relevant section of Exhibit A is shown here (blue and red outlines added for illustrative purposes):



To describe the Submit Order button and the notice of terms (each outlined in red) as "adjacent" is obviously misleading.[3] Moreover, the notice of terms is not set apart or highlighted in any way;

---

[2] Notably, Ms. Green does not provide copies of the other screens that Plaintiff would have seen as part of DSG's "checkout flow." Exhibit A indicates that, after selecting the item she wished to purchase, Plaintiff would have been required to complete screens entitled "Address," "Delivery," and "Pay" before proceeding to the "Review" screen that includes the reference to DSG's ToU. That DSG has failed to provide copies of other screens supports a strong inference that those screens do not include any references to the ToU.

[3] "*Adjacent*, may or may not imply contact but always implies absence of anything of the same kind in between." https://www.merriam-webster.com/dictionary/adjacent (last visited Feb. 14, 2022).

instead, it is camouflaged by surrounding verbiage unrelated to the ToU. The hyperlink to the ToU, in the third sentence was in green type, not bolded, and not underlined, contrary to the internet-standard blue underlined type for hyperlinks. Missing from the notice of terms is any mention of arbitration.

Moreover, had Plaintiff clicked the "Terms and Conditions" hyperlink, she would have seen a document entitled "Terms of Use," not "Terms and Conditions." Green Decl., Ex. C. If Plaintiff had then chosen to review those "Terms of Use" (notwithstanding that she was supposedly agreeing to "Terms and Conditions"), Plaintiff would have seen no reference to arbitration unless she scrolled down to the *seventh* page of the ToU, where the word "arbitration" appears for the first time as the 103rd word in paragraph 20:

> 20. Disputes, Choice of Law, and Jurisdiction. Unless expressly addressed in the Additional Terms, these Terms supersede any other agreement between you and DICK'S to the extent necessary to resolve any inconsistency or ambiguity between them. The Site is administered by DICK'S from its offices in Pennsylvania. These Terms will be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to any principles of conflicts of laws. Any matter and/or dispute relating in any way to your visit to or interaction with the Site, including compliance with these Terms, shall be submitted to binding confidential arbitration in Pittsburgh, Pennsylvania as provided in Section 21 (herein). Notwithstanding the foregoing, to the extent you have in any manner violated or threatened to violate our intellectual property rights, We may seek injunctive or other appropriate relief in the state courts of the Commonwealth of Pennsylvania or the United States District Court for the Western District of Pennsylvania, and you consent to exclusive personal jurisdiction and venue in such courts.
>
> ANY CAUSE OF ACTION OR CLAIM YOU MAY HAVE ARISING OUT OF OR RELATING TO THESE TERMS OR THE SITE MUST BE COMMENCED WITHIN ONE (1) YEAR AFTER THE CAUSE OF ACTION ACCRUES, OTHERWISE, SUCH CAUSE OF ACTION OR CLAIM IS PERMANENTLY BARRED.
>
> Any dispute resolution proceedings relating to these Terms or the Site will be conducted only on an individual basis and not as a class, consolidated, joined or representative action and the parties expressly waive all rights to commence or participate in any class, consolidated or representative action/proceeding. You agree that DICK'S agreement to arbitrate claims constitutes consideration for such waiver.

*Id*. The arbitration provision was not set off from other text, and was not bolded, underlined, italicized, or highlighted in any way. If DSG had been trying to purposely conceal the existence of the arbitration clause from its website users, it could not have done a better job.

Thus DSG, lacking any verifiable record that Plaintiff accessed the ToU in 2016 (or at any other time) cannot establish that Plaintiff had actual notice of the ToU.

## B. The Alleged 2017 Email Did Not Provide Sufficient Notice of Terms And There Is No Evidence Of Assent

DSG asserts that Plaintiff also assented to the arbitration clause in the 2017 ToU, when "DSG sent an email to customers, including Ms. Guevara, notifying them of changes to the DSG Terms and their ability to opt out of the arbitration provision." Mot. at 3. DSG provides the text of the 2017

email and a copy of the actual email showing the layout and font sizes of the various sections of the email, revealing that DSG's references to arbitration appear in the same font as the body of the email with no attempt to call the reader's attention to those references sufficient to provide notice of the revised ToU and arbitration provisions. Declaration of Julie Salas ("Salas Decl."), ¶¶ 4-5, Exs. A, B. Moreover, although Ms. Green avers that DSG sent the email to Plaintiff at two different email addresses, DSG offers no documentation of the email actually being sent to those addresses. Green Decl., ¶ 4. Most importantly, other than Ms. Green's self-serving and unsubstantiated proclamations, DSG provides no evidence that Plaintiff received or opened the email at either of the email addresses. *Id.*, ¶ 5.

DSG's 2015 ToU provides: "DICK'S may revise these Terms at any time and from time to time by updating this posting, and such revisions shall be effective immediately upon being posted to the Site . . . . Your continued use of the Site after any modifications indicates your acceptance of these Terms, as modified." Green Decl., ¶ 7, Ex. C. DSG's 2017 ToU states: "Your access and/or use of a site confirms your unconditional acceptance of the following terms." *Id.* DSG claims that Plaintiff accessed or used DSG's website at "on multiple occasions" after the ToU was modified in 2017; however, DSG offers no documentary evidence in support of this statement.

DSG's assertion that "DSG has no record that Ms. Guevara opted out of the arbitration provision after receiving [the 2017 email] and engaging in subsequent interactions with the DSG website" does not constitute evidence of assent. [4] Green Decl., ¶ 8. First, Ms. Guevara had no reason to opt out of the arbitration provision because she did not receive notice and did not assent to be bound by the 2017 ToU. Second, the 2017 ToU provided that "the notice [to opt out of arbitration] must be sent within thirty (30) days of your first use of a Site after the effective date of these Terms, otherwise you shall be bound to arbitrate disputes in accordance with the terms of those Sections."

---

[4] In addition, DSG's reference to Ms. Guevara's election not to opt out of the mandatory arbitration clause raises the obvious question of how many recipients of the email did, in fact, opt out of the arbitration provision. DSG's failure to provide this information supports an inference that the number was exceedingly small, thus raising an inference about the inadequacy of DSG's 2017 email as "notice" of the opt-out provision.

Green Decl., ¶ 7, Ex. C. There is no evidence (other than Ms. Green's conclusory and unsupported statement) that Ms. Guevara ever used the DSG website after the effective date of the 2017 ToU and, thus, the 30-day period never expired.

**C.      The Scope Of The Arbitration Clauses Applies Only To Use Of The Website, Not A Return Attempted To Be Made In-Store**

As to the scope of DSG's arbitration clause, and the class action waiver precluding public injunctive relief, the 2015 ToU provides:

- Any matter and/or dispute relating in any way to your visit to or interaction with the Site, including compliance with these Terms, shall be submitted to binding confidential arbitration in Pittsburgh, Pennsylvania as provided in Section 21 (herein).

Green Decl., Ex. C, p. 28, ¶ 20.

Similarly, DSG's 2017 ToU provides, in relevant part:

- "These Terms contain provisions that govern how claims you and DICK'S (or any member of the Family of Businesses) have against each other relating to the Sites are resolved[.]"
- If the parties don't reach an agreed upon solution pursuant to the dispute-resolution contemplated in Section 20(a) of these Terms, you and DICK'S each agree that any dispute, claim or controversy arising out of or relating to the Sites (including, without limitation, DICK'S digital operations at or through our websites, our mobile/tablet sites, our social media presence, our Scorecard program, our applications, and our stores/locations for each member of our Family of Businesses), or these Terms or the breach, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration before one arbitrator.

*Id.* at 29; 38-40, ¶ 21. DSG makes no argument and offers no evidence that Plaintiff's claims in this lawsuit relate to DSG's websites or Plaintiff's use of those sites.[5]

---

[5] While the 2017 ToU purports to define "Sites" as including "our websites, our mobile/tablet sites, our social media presence, our Scorecard program, our applications, and our stores/locations," usage of the term throughout the ToU distinguishes "stores" from "Sites" (e.g., "We will notify you of changes to these Terms by posting the amended terms on the Sites;" "For general comments or questions about our Sites or Stores call our Customer Service Department;" "By accessing or using the Sites, including by registering an account on a Site, you represent and warrant that you are eighteen (18) years of age or older[.]").

7

IV.    APPLICABLE LEGAL STANDARDS

"Arbitration is strictly a matter of consent, and thus is a way to resolve those disputes – *but only those disputes* – that the parties have agreed to submit to arbitration." *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 299 (2010) (emphasis in original) (internal quotation marks and citation omitted). "[A] party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). A motion to compel arbitration can only be granted if the court determines that "(1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009) (citing *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005); *Quiles v. Fin. Exch. Co.*, 879 A.2d 281, 283 n.3 (Pa. Super. Ct. 2005)).

Motions to compel arbitration are reviewed under the summary judgment standard. *Kirleis* 560 F.3d at 156, n.3. A court will compel arbitration only when there is "no genuine issue of fact concerning the formation of the agreement to arbitrate." *Id.* at 159. In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. *Matreale v. New Jersey Dep't of Military & Veterans Affairs,* 487 F.3d 150, 152 (3d Cir. 2007); *Woodside v. Sch. Dist. of Phila. Bd. of Educ.,* 248 F.3d 129, 130 (3d Cir. 2001). Thus, if the Court views any of the material facts regarding contract formation as being in dispute, DSG's motion must be denied.

It is well established that the Federal Arbitration Act (FAA), reflects a "strong federal policy in favor of the resolution of disputes through arbitration." *Alexander v. Anthony Int'l., L.P.*, 341 F.3d 256, 263 (3d Cir. 2003). But this presumption in favor of arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between the parties. *Century Indem. Co. v. Certain Underwriters at Lloyd's, London, Subscribing to Retrocessional Agreement Nos. 950548, 950549, 950546*, 584 F.3d 513, 527 (3d Cir. 2009). Agreements to arbitrate are upheld only where the parties have agreed to arbitrate in a "clear and unmistakable manner."

8

*Emmaus Mun. Auth. v. Eltz*, 204 A.2d 926, 927 (Pa. 1964). It is also "well settled that where the dispute at issue concerns contract formation, the dispute is generally for the courts to decide." *Granite Rock Co. v. Int'l Bd. of Teamsters*, 561 U.S. 287, 296 (2010) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).)

The FAA instructs courts to refer to principles of applicable state law when determining the existence and scope of an agreement to arbitrate. *See Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 475 (1989). Courts generally "apply ordinary state-law principles that govern the formation of contracts" to decide "whether the parties agreed to arbitrate a certain matter (including arbitrability)." *Kaplan*, 514 U.S. at 944. In deciding which law should determine whether parties entered into a valid agreement to arbitrate, Federal courts generally look to the law of the forum state. *Gay v. CreditInform*, 511 F.3d 369, ___ n.13 (3d Cir. 2007).

Under Pennsylvania law, the party seeking arbitration bears "the burden of demonstrating that a valid agreement to arbitrate exists between the parties, and that the dispute is within the scope of the agreement." *Goldstein Depository Trust Co.*, 717 A.2d 1063, 1067 (Pa. Super. Ct. 1998). Contract formation requires: (1) a mutual manifestation of an intention to be bound, (2) terms sufficiently definite to be enforced, and (3) consideration. *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002). The Pennsylvania Supreme Court has held that an agreement to arbitrate cannot arise "by implication." *Emmaus Mun. Auth.,* 204 A.2d at 927. "[E]xplicit agreement is essential to the formation of an enforceable arbitration contract." *Kirleis*, 560 F.3d at 163. "'[M]ust have known' or 'should have asked' falls short of the standard required by Pennsylvania law that plaintiff *actually agree* to arbitrate her claims." *Id*. at 161 (emphasis in original).

"Although the enforceability of web-based agreements will often depend on a 'fact-intensive inquiry,' the Court may determine that a web-based agreement to arbitrate exists where notice of the agreement was 'reasonably conspicuous and manifestation of assent unambiguous as a matter of law.'" *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308, 331 (W.D. Pa.

9

2020) (quoting *Meyer v. Uber Techs. Inc.*, 868 F.3d 66, 76 (2d Cir. 2017)). "[I]n assessing whether a party manifested an intent to enter a contract, the Court looks not to inward, subjective intent but, rather, to the 'intent a reasonable person would apprehend in considering the parties' behavior.'" *HealthplanCRM*, 458 F. Supp. 3d at 331-32 (quoting *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009)). As will be shown below, Plaintiff never even knew of DSG's ToU, let alone manifest an intent to be bound by its terms.

## V.    ARGUMENT

### A.    No Arbitration Contract Was Formed

#### 1.    Plaintiff Did Not Consent to Arbitration Under the 2015 ToU

DSG contends that Plaintiff agreed to DSG's 2015 ToU by clicking on the "Confirm Purchase" button in the course of making a purchase on the DSG website in 2016. The 2015 ToU was presented to Plaintiff and other website users in a form known as a "sign-in wrap" agreement, which occurs when "a website notifies the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advises the user that he or she is agreeing to the terms of service when registering or signing up." *See, e.g., Peter v. DoorDash, Inc.,* 445 F. Supp. 3d 580, 585 (N.D. Cal. 2020).

It is black-letter law that the formation of a contract requires "manifestation of mutual assent." *In re Carbone*, 626 B.R. 262, 266 (Brnkr. E.D. Pa. 2021) (citing RESTATEMENT (SECOND) OF CONTRACTS § 17). Moreover, under Pennsylvania law, a contract's terms must be set forth with sufficient clarity as to be specifically enforced. *Ryan v. Temple Univ.*, 535 F. Supp. 3d 356, 364 (E.D. Pa. 2021). In ascertaining the existence of mutual assent, the relevant inquiry is what a reasonable person would understand the intent of parties to be given their objective manifestations. *Am. Eagle Outfitters*, 584 F.3d at 582-84. With regard to the terms of an agreement, the parties must articulate the material details of the bargain such that the extent of their obligations is evident on the face of the contract. *Id.*

"[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose

10

contractual nature is not obvious." *Noble v. Samsung Electronics Am., Inc.*, 682 F. App'x 113, 116 (3d Cir. 2017) (quoting *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1285 (9th Cir. 2017)); *see also Oak Street Printery, LLC, v. Fujifilm North Am. Corp.*, 895 F. Supp. 2d 613, 619 (M.D. Pa. 2012)  (rejecting contract provision where doubts whether the forum selection clause at issue was reasonably conspicuous or whether plaintiff manifested assent to the Terms and Conditions) "Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Id.* (quoting *Specht v. Netscape Commc'n Corp.,* 306 F.3d 17, 35 (2d Cir. 2002).)

A term or clause is "conspicuous" when it is "so written that a reasonable person against whom it is to operate ought to have noticed it." *Moscatiello v. Pittsburgh Contractors Equipment Co.,* 595 A.2d 1190, 1193 (Pa. Super. Ct. 1991). Language in the body of a form is conspicuous if it is in larger than the surrounding text, in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language." 13 Pa.C.S.A. § 1201. The primary object of the conspicuousness requirement is to avoid fine print waiver of rights by the buyer. *Greenspun v. American Adhesives, Inc.,* 320 F. Supp. 442 (E.D. Pa. 1970); *see also In re Carbone*, 626 B.R. at 266 (denying arbitration where the terms were buried in a manner that gave no hint to a consumer that an arbitration provision was within).

Plaintiff could not have assented to the ToU in 2016 because DSG failed to adequately notify Plaintiff that the confirmation of her purchase would result in a contractual agreement to arbitrate disputes. "[I]f a party wishes to bind in writing another to an agreement to arbitrate future disputes, such purpose should be accomplished in a way that each party to the arrangement will fully and clearly comprehend that the agreement to arbitrate exists and binds the parties thereto." *Specht*, 306 F.3d at 30 (internal citation omitted). DSG makes no claim that Plaintiff here had actual knowledge of the ToU, and any claim that Plaintiff had constructive knowledge of the ToU based on the reference to the ToU on the "Submit Order" page of the website is logically and legally untenable.

11

Other courts reject motions to compel arbitration where notice of the terms containing the arbitration provision was insufficiently conspicuous. For example, in *Nicosia*, 834 F.3d at 236, in circumstances virtually identical to those present here, the Second Circuit reversed the district court's grant of Amazon's motion to dismiss on the basis of an arbitration clause in Amazon's Conditions of Use, holding that the notice of the terms was insufficient to bind the website user. Amazon claimed the plaintiff agreed to the arbitration clause in the term by clicking the "Place your order" button on a page that included the statement: "By placing your order, you agree to Amazon.com's privacy notice and conditions of use." *Id*. at 236. In declining to enforce Amazon's terms, the court observed:

> Notably, unlike typical "clickwrap" agreements, clicking "Place your order" does not specifically manifest assent to the additional terms, for the purchaser is not specifically asked whether she agrees or to say "I agree." Nothing about the "Place your order" button alone suggests that additional terms apply, and the presentation of terms is not directly adjacent to the "Place your order" button so as to indicate that a user should construe clicking as acceptance.

*Id*. at 236-37. Exactly the same is true here: nothing about the "Submit Order" button on the DSG website indicated that Plaintiff would be accepting a set of contractual terms of conditions by clicking the button. Also as in *Nicosia*, DSG's notice of terms was not "directly adjacent" to the "Submit Order" button. Importantly, however, in *Nicosia*, the notice of terms was located near the *top* of the webpage, above the "Place your order" button, and was set off on its own:



*Id*. at 241. In contrast, the notice of terms on the DSG Order Review page was at the *bottom* of the page, below both "Submit Order" buttons, in the center of the page (away from the bottom "Submit Order" button), and was sandwiched in the following paragraph in miniscule type:

Click the Submit Order button only once. You will be charged when your order ships or is picked up in the store.
By placing your order, you affirm that you agree to our Terms and Conditions and Privacy Policy. With respect to each item
in your order, your purchase will be complete when the item ships or is picked up in the store.

Green Decl., Ex. A. DSG misrepresents that the links to "Terms and Conditions" and "Privacy Policy" are "set apart in green text." Mot. at 2. Not only are the hyperlinks self-evidently not "set apart" from other text, but they appear in green font (that is more difficult to see than the regular black), in the third sentence of a four-sentence paragraph, and the links are not underlined, contrary to the internet standard of hyperlinks being blue and underlined.[6] Some green text on the page appears to be hyperlinks, other green text does not, thus requiring a website user to guess whether "Terms and Conditions" in green was or was not a hyperlink. Courts have repeatedly held that online users are not bound to hyperlinked terms that are positioned where the terms are unlikely to be seen or noticed. *See, e.g., HealthplanCRM*, 458 F. Supp. 3d at 334 (citing *Nguyen v. Barnes & Noble, Inc.*, No. 8:12–cv–0812, 2012 WL 3711081, at \*3–4 (C.D. Cal. 2012), *aff'd*, 763 F.3d 1171 (9th Cir. 2014)).

In addition, the Amazon notice referred to "placing your order," which the user did by clicking the "Place your order" button, whereas the DSG notice referred to "placing your order" but the relevant button said, "Submit order," thus creating the potential for further confusion on the part of any website user who managed to find the notice at all. And the "Terms and Conditions" link on the Amazon site linked to a document with the same title, unlike the link on the DSG site.[7]

Also as in *Nicosia*, the 2016 and 2017 DSG webpages contained "numerous other links . . . in several different colors, fonts, and locations, which generally obscure the message." *Nicosia v.*

---

[6] WIKIPEDIA, "By default, browsers will usually display hyperlinks as such: An unvisited link is usually blue and underlined." https://en.wikipedia.org/wiki/Hyperlink (last visited Feb. 14, 2022).

[7] Notably, DSG's current website includes improvements on some of the obvious inadequacies of the 2016 website. The current site includes notice of the ToU on two separate pages, not just one as in 2016. See Declaration of Henry J. Kelston  Exs. B and C. On each page, the notice of terms is completely set off from other text (in contrast to its appearance in the middle of a four-sentence paragraph in 2016), and the hyperlinks are underlined. The pages are not cluttered with promotional messages or advertisements with other links. And the "Terms of Use" hyperlink on the current site brings the user to a document titled "Terms of Use," not a document with a different name as in 2016 and 2017.

13

*Amazon.com, Inc.*, 834 F.3d 220, 237 (2d Cir. 2016). On the DSG Order Review page, various text is displayed in at least four font sizes and four colors (black, green, white, and brown), alongside multiple buttons and promotional advertisements. "Further, the presence of customers' personal address, credit card information, shipping options, and purchase summary are sufficiently distracting so as to temper whatever effect the notification has." *Id*. The Court concluded that "[t]he message itself—'By placing your order, you agree to Amazon.com's . . . conditions of use'—is not bold, capitalized, or conspicuous in light of the whole webpage." *Id*.; *see also Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220–21 (9th Cir. 2019) ("Users are put on constructive notice based on the conspicuousness and placement of the terms and conditions, as well as the content and overall design of the app . . . [C]ourts decline to enforce agreements where the terms are available only if users . . . parse through confusing or distracting content and advertisements") (citing *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d Cir. 2019) and *Nicosia* 834 F.3d 237. Numerous courts have found hyperlinks more conspicuous than those on the DSG site to be insufficient notice of terms. *See, e.g., Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62-63 (1st Cir. 2018) (gray rectangular box with the language "Terms of Service & Privacy Policy" displayed in a larger font, in bold, contrasting in color, and highlighted by the box around it was not reasonably conspicuous); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67 (S.D.N.Y. 2017) (hyperlink in smallest font on the screen but colored in light blue on a white background insufficient to provide notice).

That the cases cited in DSG's Motion do not support its position is evident from even a cursory review of the facts. For example, in *Bush v. Comcast Cable Commc'ns Mgmt., LLC*, No. 2:19-CV-01004, 2020 WL 4199077 (W.D. Pa. July 22, 2020) the user e-signed a letter that referred expressly to mandatory arbitration and acknowledged that she understood and agreed to be bound by the terms. Plaintiff also "admitted during her deposition . . . that she . . . acknowledge[d] and accept[ed] the arbitration policy." *Id.* at *9. In *Zabokritsky v. JetSmarter*, *Inc.*, No. CV 19-273, 2019 WL 2563738 (E.D. Pa. June 20, 2019), "[t]o complete the registration process, [plaintiff had] to slide a button next to the text, 'I agree to Terms of Use and Privacy Policy.'" *Id.* at *2. DSG does not –

14

and cannot – point to any similar affirmative acceptance or acknowledgment of terms by Plaintiff in this case.

In *Schwartz v. Comcast Corp.*, 256 F. App'x 515 (3rd Cir. 2007), the "key to [the Court's decision to enforce arbitration] was that the record showed that the plaintiff had received actual notice of the subscription agreement (a physical copy) upon subscribing." *Lewandowski v. Megabus USA, LLC,* No. 2:20-CV-241, 2020 WL 2486653, at *5 (W.D. Pa. May 14, 2020).

In sum, DSG has not met its burden of proving that the parties agreed to arbitrate in a clear and unmistakable manner in 2016. *See Quiles v. Fin. Exch. Co.*, 879 A.2d 281, 287 (Pa. Super. Ct. 2005). Nothing about the "Submit Order" button suggested that its use would signify assent to additional terms, and the notice of terms was not conspicuous or adjacent to the button so as to indicate that a user should construe clicking as acceptance. *See Nicosia*, 834 F.3d at 237. Because DSG's website did not make clear to Plaintiff that clicking on the "Submit Order" button would signify assent to DSG's ToU and the mandatory arbitration provision buried in paragraph 20 of the ToU, Plaintiff's click of that button did not manifest her assent to the ToU in general or to arbitrate any claims against DSG. *Specht*, 306 F.3d at 29–30.[8]

### 2. Plaintiff Did Not Consent to Arbitration Under the 2017 ToU

DSG contends that Plaintiff is bound by the arbitration provision in DSG's 2017 ToU because "[o]n January 11, 2017, DSG sent an email to customers, including Ms. Guevara, notifying them of changes to the DSG Terms and their ability to opt out of the arbitration provision." Mot. at 3. Significantly, the 2017 ToU included a class action waiver whereas the 2015 ToU did not. Thus, if, as DSG claims, Plaintiff assented to the 2017 ToU, she would arguably be barred from pursuing a class action in this Court or arbitration of her claims on a class basis. But DSG's reliance on the

---

[8] If the Court is unable to conclude, as a matter of law, whether the notice of terms on the DSG website was sufficiently conspicuous as to create a binding contract between Plaintiff and DSG, the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on the question. *See I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko,"* 397 F. Supp. 3d 721 (E.D. Pa. 2019), *order vacated in part on reconsideration sub nom. I.M. Wilson, Inc. v. Grichko,* No. CV 18-5194, 2019 WL 5394113 (E.D. Pa. Oct. 22, 2019), *and appeal dismissed sub nom. IM Wilson Inc v. Grishko Dance SRO*, No. 19-2953, 2019 WL 8008960 (3d Cir. Oct. 29, 2019).

15

2017 ToU to foreclose Plaintiff from pursuing her class claims is fatally flawed in numerous respects, each of which warrant denial of DSG's Motion.

First, DSG claims that its authority to issue the revised ToU in 2017 emanates from the following provision in the 2015 ToU:

> DICK'S may revise these Terms at any time and from time to time by updating this posting, and such revisions shall be effective immediately upon being posted to the Site, however, any changes to the dispute resolution provisions set forth below will not apply to any disputes for which the parties have actual notice prior to the date the change is posted on the Site. . . . Your continued use of the Site after any modifications indicates your acceptance of the these [sic] Terms, as modified.

*Id.* (quoting Green Decl., Ex. C at ¶ 1). Thus, by DSG's reasoning, Plaintiff can be bound by the 2017 ToU only if she was bound by the 2015 ToU. For the reasons described *supra* at § V.A.1., Plaintiff never assented to the 2015 ToU and was not bound by them.

Second, DSG offers no evidence that Plaintiff received or opened DSG's January 11, 2017 email, although software to track whether a recipient has opened a particular email, or whether a particular email was rejected and thus "bounced back" by a server, is readily available and commonly used by large companies like DSG. *See, e.g.*, *Miracle-Pond v. Shutterfly, Inc.*, No. 19-CV-04722, 2020 WL 2513099, at *3 (N.D. Ill. May 15, 2020) ("Shutterfly's records indicate that Ms. Miracle-Pond opened that email on September 8, 2019."); *Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 926 (N.D. Cal. 2015), *aff'd*, 694 F. App'x 612 (9th Cir. 2017) ("On August 29, 2012, Safeway sent an email to customers who had opened an email from Safeway.com in the last six months."); *Sacchi v. Verizon Online LLC*, No. 14-CV-423-RA, 2015 WL 765940, at *3 (S.D.N.Y. Feb. 23, 2015) ("Verizon's records indicate that both emails were successfully delivered, and that the email to StephenSimoni@yahoo.com was opened on the same day it was delivered."). Thus, DSG fails to establish that Plaintiff had notice of the 2017 modifications to the ToU. "[T]he law is that the terms of a contract may be changed only with the full understanding and agreement of both parties to the

contract." *Southeastern Penn. Transp. Auth. v. Transit Cas. Co.*, 412 F. Supp. 839, 843 (E.D. Pa. 1976).

Third, even if Plaintiff had notice of the 2017 ToU, DSG provides no evidence that Plaintiff accepted the modified terms by continuing to use the DSG website after receiving such notice, other than Ms. Green's self-serving and conclusory statement that DSG records show that the use of Plaintiff's email addresses clicked on the links in the emails and accessed DSG's website (without producing any documentation in support) (Green Decl., ¶ 5). The 2015 ToU provides: "Your continued use of the Site after any modifications indicates your acceptance of these Terms, as modified." *Id.*, Ex. C at ¶ 1. The 2017 ToU states: "YOUR ACCESS AND/OR USE OF A SITE CONFIRMS YOUR UNCONDITIONAL ACCEPTANCE OF THE FOLLOWING TERMS." DSG's Motion arguing that Plaintiff is bound by the 2017 ToU simply ignores these provisions.

Finally, while DSG provides the text of the 2017 email and a copy of the actual email showing the layout and font sizes of the various sections of the email, inspection reveals that DSG's references to arbitration appear in the same font as the body of the email with no attempt to call the reader's attention to them through font type or size, color, or other symbols sufficient to provide notice of the revised ToU and arbitration provisions. Salas Decl., ¶¶ 4-5, Exs. A, B. The Evidentiary Objections filed concurrently herewith should be sustained and the Motion denied on this basis as well.

### 3.    That Plaintiff Did Not Opt Out of Arbitration Does Not Indicate Manifestation of Assent to Arbitrate.

DSG contends that Plaintiff manifested assent to the arbitration provision in the 2017 ToU by "failing" to opt out of that provision pursuant to instructions given in the provision itself. Mot. at 3. This argument fails on multiple grounds, both factual and legal. First, Plaintiff had no reason or obligation to opt out of the arbitration provision because, as explained *supra* in § V.A.1., the provision was contained in ToU she had no notice of and to which she never assented. Second, DSG's arbitration provision required Plaintiff to opt out by sending written notice "within thirty (30) days of your first use of a Site after the effective date of these Terms." But, while DSG claims to have records documenting Plaintiff's use of the website in 2016, DSG offers no evidence to show that

17

Plaintiff used the DSG website after the effective date of the 2017 Terms. Thus, even if Plaintiff is bound by the 2017 ToU – and she is not – her time to opt out of the arbitration clause never expired and she cannot be said to have "failed" to opt out. *See* Mot. at 12 ("A consumer agrees to terms where she fails to opt out or continues to use a service despite notice that such an action constitutes agreement to the terms.").

Third, DSG's opt-out provision is unconscionable in that it imposes an unreasonable burden on Plaintiff by requiring written notice . . . to opt out . . . via certified mail." DSG claims that it provided adequate notice of the 2017 ToU by sending an email to Plaintiff. There is no legitimate reason for DSG not to permit a recipient of that email to use email in turn to opt out of the arbitration provision.

Fourth, DSG's claim that Plaintiff's failure to opt out of the arbitration clause constitutes manifest assent is simply wrong as a matter of law. Under Pennsylvania law, an offeree's inaction after receipt of an offer is generally insufficient to form a contract. *Acme Markets, Inc. v. Int'l Ass'n of Machinists and Aerospace workers, Local Lodge No. 724*, 506 F. Supp. 92, 99 (E.D. Pa. 1980) (citing *Beach v. U.S.*, 226 U.S. 243, 259 (1912)) ("It is a fundamental legal axiom that, generally, an offeree need not make any reply to an offer and that silence and inaction cannot be construed as an assent."). DSG's offer to arbitrate all disputes with Plaintiff cannot be turned into an agreement because Plaintiff made no reply.

For all of these reasons, Plaintiff's failure to opt out of the arbitration provision of the 2017 ToU is of no significance and surely did not signal her assent to arbitrate this dispute.

### B.    DSG's Arbitration Clause Does Not Cover Plaintiff's Claims.

This Court has that authority to determine whether the parties agreed to arbitrate Plaintiff's claims regarding DSG's collection, sharing, and use of Plaintiff's personal information. A motion to compel arbitration can only be granted if the court determines that "(1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement." *Kirleis*, 560 F.3d at 160. The plain language of DSG's arbitration provision leaves no doubt that the issues in this case are not within the scope of that provision. DSG's 2015 ToU states, in relevant part: "Any matter

18

and/or dispute *relating in any way to your visit to or interaction with the Site*, including compliance with these Terms, shall be submitted to binding confidential arbitration in Pittsburgh, Pennsylvania as provided in Section 21 (herein)." Mot. at 5 (emphasis added).[9] DSG claims that Plaintiff "visited" and "interacted" with the DSG website to make a purchase on July 27, 2016. Plaintiff's claims in this action arise from her attempted return or exchange of merchandise, in person, in a brick-and-mortar store, in June 2020. *Id.* ¶ 89. DSG does not claim that Plaintiff's claims "*relat[e] in any way to [her] visit to or interaction with the Site,*" or that there is any nexus between Plaintiff's claims and her use of the site in 2016.

DSG disingenuously argues that "courts hold that agreements requiring arbitration of '[a]ny dispute, claim or controversy arising out of or relating to this Agreement' is broad and presumptively covers all disputes between the parties," and cites cases enforcing arbitration agreements covering "all" disputes between the parties. Mot. at 17. DSG again simply ignores inconvenient language in its own ToU: the arbitration provision is expressly limited to disputes that "relate [to a] visit or interaction" with DSG's website.

In contrast, the 2015 ToU also states: "These Terms of Use (these 'Terms') are provided by DICK'S and are applicable to all DICK'S operations at or through our websites, our mobile/tablet sites, our social media presence, our applications, and our stores/locations." Green Decl., Ex. C. Clearly, the drafters of DSG's ToU know how to draft language broad enough to cover in-store transactions but did not include such language in the arbitration clause. Further, paragraph 20, containing the arbitration provision, also provides: "Any cause of action or claim you may have arising out of relating to these terms or the site must by commenced within on (1) year after the cause of action accrues[.]" This language further confirms that the arbitration clause does not cover "all disputes between the parties," as the coverage of the one-year rule is broader than the scope of the arbitration provision.

---

[9] The "Site" as used in the 2015 ToU can only be interpreted to mean the DSG website. *See* Green Decl., Ex. C, second paragraph: Welcome and thank you for visiting this site (the "Site"), which is owned and operated by Dick's Sporting Goods, Inc….").

It cannot reasonably be disputed that Plaintiff's claims in this action are beyond the scope of the arbitration provision DSG drafted and inserted in its ToU.

## VI.    CONCLUSION

For all of the above reasons, DSG's Motion to Compel Arbitration should be denied.

DATED: February 14, 2022                    Respectfully submitted,

                                            /s/ Andrew W. Ferich
                                            Andrew W. Ferich
                                            aferich@ahdootwolfson.com
                                            **AHDOOT & WOLFSON, PC**
                                            201 King of Prussia Road, Suite 650
                                            Radnor, PA 19087
                                            310.474.9111 (*telephone*)
                                            310.474.8585 (*facsimile*)

                                            Tina Wolfson*
                                            twolfson@ahdootwolfson.com
                                            Theodore Maya*
                                            tmaya@ahdootwolfson.com
                                            Bradley K. King*
                                            bking@ahdootwolfson.com
                                            Christopher Stiner*
                                            cstiner@ahdootwolfson.com
                                            **AHDOOT & WOLFSON, PC**
                                            2600 W. Olive Avenue, Suite 500
                                            Burbank, California 91505
                                            310.474.9111 (*telephone*)
                                            310.474.8585 (*facsimile*)

                                            Cornelius P. Dukelow*
                                            Oklahoma Bar No. 19086
                                            cdukelow@abingtonlaw.com
                                            **ABINGTON COLE + ELLERY**
                                            320 South Boston Avenue, Suite 1130
                                            Tulsa, Oklahoma 74103
                                            918.588.3400 (*telephone & facsimile*)

                                            Benjamin F. Johns
                                            BFJ@chimicles.com

20

**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH, LLP**
One Haverford Centre
361 West Lancaster Avenue
Haverford, PA 19041
610.642.8500 (*telephone)*
610.649.3633 (*facsimile*)

\*pro hac vice* to be filed

*Counsel to Plaintiffs and the Proposed Class*

21

## CERTIFICATE OF SERVICE

I, Andrew W. Ferich, hereby certify that this document was electronically filed and served using the Court's CM/ECF system on February 14, 2022.

/s/ Andrew W. Ferich
Andrew W. Ferich